Dennis **CURLEY**, Plaintiff,

v.

**AMERICAN AIRLINES, INC.**, Defendant.

No. 91 Civ. 2724 (WK).

United States District Court,
S.D. New York.

March 7, 1994.

**4. Federal Courts** �business372

Martin J. Birn, New York City, for plaintiff.

Jeffrey J. Ellis, Quirk and Bakalor, P.C., New York City, for defendant.

## OPINION AND ORDER

WHITMAN KNAPP, Senior District Judge.

In this diversity action plaintiff passenger Dennis Curley ("plaintiff") alleges that he was detained and searched by Mexican authorities after having been falsely identified by the captain of his flight as having smoked marijuana in the lavatory of the aircraft, and claims negligence and false imprisonment. Defendant American Airlines ("defendant") seeks summary judgment on the grounds that plaintiff's state cause of action is preempted: (1) by the Warsaw Convention, under which neither punitive damages nor damages for psychological injuries are permitted; or, in the alternative, (2) by the Federal Aviation Act as amended by the Airline Deregulation Act, 49 U.S.C. § 1301 et seq. In addition, the parties have briefed and argued a choice of law question, plaintiff submitting that New York law should be applied, defendant arguing for the application of Mexican law. For the reasons that follow, we deny defendant's motion for summary judgment, and reserve decision on the law to be applied.

### BACKGROUND

Drawing, as we must, all reasonable inferences in favor of the plaintiff, the relevant facts are as follows:

On Christmas day of 1990, plaintiff and a companion boarded, at New York's LaGuardia airport, an American Airlines flight destined, after a layover in Dallas, for Puerto Vallarta, Mexico. Each had a round trip ticket, and planned to return to New York ten days later. The flight was uneventful. Plaintiff recalls drinking a lot of water during the New York to Dallas leg of the flight. During the Dallas layover he used a men's room in the airport. He drank more water and one beer during the flight from Dallas–Fort Worth to Puerto Vallarta, and sat in the smoking section of the aircraft where he smoked two cigarettes. He never used the lavatory during this leg of the flight. Upon landing in Puerto Vallarta, plaintiff wished the captain of the flight a merry Christmas and proceeded to disembark from the air-

craft. He and his companion then entered the terminal, and began waiting in what appeared to be a line of travelers being processed through Mexican customs. At that time, an English-speaking man wearing some sort of uniform and holding a walkie-talkie approached plaintiff and asked him how long he intended to stay in Mexico. Plaintiff replied that he intended to be there for ten days, at which point the man walked away. He soon returned, accompanied by a uniformed man who was holding a rifle. The English-speaking man asked for plaintiff's ticket. Plaintiff gave him all of his travel documents, at which point the man went away again. He and the armed man returned, at which point the former told plaintiff to "come with me, please." Although plaintiff offered no resistance, the English-speaking man guided him with a hand on the elbow to a room, in which he was directed to sit down. A woman, a different man with a rifle, and the English-speaking man were in this room. After about five minutes, plaintiff was directed to take his bags and go into another room. Two different uniformed men, who had guns in holsters and appeared to be police, were in this room. One of these, speaking in English, told plaintiff that he was in very serious trouble, that he would go to jail, and asked him "where is the marijuana?" Plaintiff asserted "there is no marijuana," to which his interrogator replied "the captain said you were smoking marijuana." Plaintiff responded that "that simply isn't true," at which point his interrogator began to search through his documents and bags. While other Mexican officials walked in and out of the room, plaintiff endured the following ordeal as outlined in his account of the facts in the Pretrial Order:

a. He was strip-searched.
b. He was cavity searched.
c. His freedom was threatened.
d. His life was threatened.
   i. Firearms were aimed at his buttocks, head and groin.
   ii. He was threatened verbally.
e. His body was touched by loaded firearms.
f. He was forced to stand naked in the presence of men and women.

g. He was verbally humiliated.
h. His belongings were searched.
i. Against his will he was examined by a Dr. Famania:
   i. His teeth and gums were scraped.
   ii. Various other demeaning tests were performed.

Plaintiff was ultimately told to get dressed and was released, after which he and his companion proceeded to take their ten day Mexican holiday.

He later learned that the captain of the Dallas to Puerto Vallarta flight, Frederick Kammire, had during the descent been informed by flight attendants' of plaintiff's suspected activity and, upon landing, had advised the defendant's ground crew that plaintiff was suspected of having smoked marijuana in the aircraft lavatory during the descent. The ground crew informed the Mexican customs authorities of this suspicion. Based upon this false accusation, plaintiff was subjected to the above-described misadventure.

In August of 1991, plaintiff, at the suggestion of the attorney he had retained to pursue an action against defendant, underwent a psychological evaluation by a Dr. Arnold Laschewer. After three visits, Dr. Laschewer diagnosed him as suffering from Post Traumatic Stress Disorder, which resulted in symptoms such as anxiety, anger, the deterioration of his relationship with his lover, and flashbacks of the trauma which were affecting his ability to work. Plaintiff further contends that he suffers from headaches, nightmares and insomnia.

## DISCUSSION

### A. The Warsaw Convention

Defendant contends that this cause of action is preempted by Article 17 of the Warsaw Convention ("the Convention"), which—in the absence of proof of willful misconduct—limits recovery to $75,000, and wholly denies recovery for "psychological" as opposed to "actual" damages. For present purposes, we find immaterial whether or not plaintiff could establish willful misconduct or

whether or not his damages were purely psychological.

Article 17 of the Convention applies to "all international transportation of persons, baggage, or goods performed by aircraft for hire," and provides as follows:

The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or *in the course of any of the operations or in the course of embarking or disembarking.* (emphasis supplied).

The applicability of the Convention to this claim turns on whether or not plaintiff's injuries, be they physical or psychological, were caused by an "accident" within the meaning of Article 17. We find that the captain's unfounded suspicion that plaintiff had been smoking marijuana in the aircraft and the relaying—after the landing—of such suspicion to defendant's ground crew did not relate to "operations" of the aircraft or occur in the course of "disembarking." Moreover, those activities did not constitute an accident within the contemplation of the signers of the Convention.

■ The Convention was created to enable the airline industry to withstand financial reverses brought about by the large scale disasters which can occur with this particular mode of travel. "The primary purpose of the contracting parties to the Convention [was to] limit[ ] the liability of air carriers in order to foster the growth of the fledgling commercial aviation industry." *Eastern Airlines v. Floyd* (1990) 499 U.S. 530, 546, 111 S.Ct. 1489, 1499, 113 L.Ed.2d 569. "It was expected that [the Convention's limitation of liability] ... would enable airlines to attract capital that might otherwise be scared away by the fear of a single catastrophic accident." Lowenfeld & Mendelsohn, The United States and the Warsaw Convention, 80 Harv.L.Rev. 497, 499 (1967).

The Supreme Court has broadly defined an "accident" under Article 17 as "an unexpected or unusual event or happening that is external to the passenger." *Air France v. Saks* (1985) 470 U.S. 392, 405, 105 S.Ct. 1338, 1345, 84 L.Ed.2d 289. On the theory that hijackings and terrorist attacks are risks characteristic of air travel, liability under the Convention has been expanded to included injuries resulting from such attacks. *Martinez Hernandez v. Air France* (1st Cir.1976) 545 F.2d 279, *cert. den.,* 430 U.S. 950, 97 S.Ct. 1592, 51 L.Ed.2d 800 (1977). *See also Day v. Trans World Airlines* (2d Cir.1975) 528 F.2d 31, 34, *cert. denied,* 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976) (Carriers are in the best position to guard against terrorist actions and hijackings).

The highly unusual happenstance of being falsely suspected and accused of smoking marijuana in an aircraft lavatory is hardly a characteristic risk of air travel and certainly has nothing to do with the "operations" of or "embarking or disembarking" from the aircraft. We are confident that the drafters of the Warsaw Convention had no such possibility in mind when they devised the cap on liability for accidents occurring in the course of international flight. We are equally confident that by declining to apply the Convention to this action, we are creating no threat to the stability of the commercial aviation industry.

**B. Preemption by the Federal Aviation Act**

■ Defendant alternatively contends that plaintiff's state law claim is preempted by the Federal Aviation Act, 49 U.S.C. § 1305(a)(1) ("the Act"), which provides (emphasis supplied):

[N]o State or political subdivision thereof ... shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to *rates, routes,* or *services* of any air carrier having authority ... to provide interstate air transportation.

Defendant principally relies upon the recent Supreme Court case of *Morales v. Trans World Airlines,* (1992) 504 U.S. ——, 112 S.Ct. 2031, 119 L.Ed.2d 157, for the proposition that the plaintiff's state law claims relate to the service of the air carrier and are therefore preempted by the Act. It also cites three cases arising in the Fifth Circuit, *O'Carroll v. American Airlines, Inc.*

(5th Cir.1989) 863 F.2d 11, *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3158, 104 L.Ed.2d 1021 (1989); *Baugh v. Trans World Airlines, Inc.,* 915 F.2d 693 (5th Cir.1990); and *Howard v. Northwest Airlines, Inc.* (S.D.Tex., 1992) 793 F.Supp. 129.

The decision in *Morales* has no application to the facts at bar. There, the Court upheld an injunction against an attempt of state attorneys general to regulate the manner in which airlines could advertise their rate structure. The Court, in an opinion by Justice Scalia, went to great lengths to demonstrate that it is impossible to regulate the methods of advertising a rate structure without ultimately affecting the *rates* themselves.

As to the Fifth Circuit cases, they are similarly distinguishable. In *O'Carroll,* plaintiff had sought damages arising out of having been wrongly excluded from a flight. His exclusion had been based on the airline's determination that he had been drunk and disorderly. The court ruled, among other things, that plaintiff's claim was preempted by section 1511 of the Act, which provides in part:

> Subject to reasonable rules and regulations prescribed by the Secretary of Transportation, any such carrier may also *refuse transportation of a passenger* or property where, in the opinion of the carrier, such transportation would or might be inimical to safety of the flight. (emphasis added).

863 F.2d at 12 (*quoting* 49 U.S.C.App. § 1511(a)).

In *Howard,* the plaintiff was the daughter of a deceased airline passenger who had been on a journey from Houston to Louisville which required a change of planes at Memphis. Being in a feeble condition, he needed assistance from the airline to make such a change. The airline negligently failed to provide such service, with the result that he continued on the original plane until it arrived at Newark, its final destination, where he ultimately died. The court quite properly found that the transfer of passengers from one plane to another constituted a *service* within the meaning of the Act, and that plaintiff's wrongful death claim was therefore preempted.

In *Baugh,* plaintiff claimed that a stewardess had negligently stomped on his foot while, apparently, she was stowing another passenger's luggage, thus in the course of the flight performing a *service* normally expected of flight attendants.

In the case at bar, the captain's passing on to ground personnel accurate or inaccurate information concerning a passenger's smoking habits certainly has no relation to any *rates* or *routes,* nor does it refer to *services* normally expected of flight personnel. Indeed, it seems to come squarely within the exception noted in *Morales,* namely conduct which affects airline services in "too tenuous, remote, or peripheral a manner to have any preemptive effect," quoting *Shaw v. Delta Airlines, Inc.* (1983) 463 U.S. 85, 100, 103 S.Ct. 2890, 2901, 77 L.Ed.2d 490.

## C. Choice of Law

Plaintiff is a resident of New York, while defendant, a Delaware corporation with its principle place of business in Texas, routinely picks up and discharges passengers at LaGuardia and Kennedy airports. The relationship between plaintiff and defendant began, and ended, in New York. Defendant's alleged negligence is claimed to have occurred after landing in the Puerto Vallarta, Mexico airport. Plaintiff urges that New York state has a salient interest is application of its law to this matter; defendant submits that the law of Mexico, where the alleged tort is claimed to have taken place, should apply.

When federal jurisdiction is based upon diversity, a federal court must be guided by the rules of the jurisdiction in which it sits. *Klaxon Co. v. Stentor Electric Mfg. Co., Inc.* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Plaintiff's original complaint included a section 1983 claim. This claim was voluntarily withdrawn by plaintiff's counsel, leaving diversity as the sole basis for federal jurisdiction. Since Judge Fuld's landmark decision, *Babcock v. Jackson* (1963) 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279, automatic application of the *lex loci delicti* rule has been replaced by the more refined "interest analysis" test.

 The most recent—and authoritative—exposition of the *Babcock* doctrine is found in two opinions by Chief Judge Judith Kaye: *Cooney v. Osgood Machinery, Inc.* (1993) 81 N.Y.2d 66, 595 N.Y.S.2d 919, 612 N.E.2d 277; and *In re Arbitration between Allstate and Stolarz, et. al.* (1993) 81 N.Y.2d 219, 597 N.Y.S.2d 904, 613 N.E.2d 936. In these opinions—for an unanimous court in *Cooney* and for a six judge majority in *Allstate*—the Chief Judge traced the history of—and evaluated—the doctrine from its inception in *Babcock* to the present day. With respect to a situation like the one before us—where plaintiff is a domiciliary of the forum state, the defendant a corporation chartered in another state but doing substantial business in the forum state and the situs of the tort is in a third jurisdiction—the following guiding principles can be gleaned from the Chief Judge's two opinions.

I. As a condition precedent to any choice of law discussion it must be established that the law of the situs is not only inconsistent with but is in conflict with the law of the forum.

II. Once such conflict is established, the "interest analysis" proposed in *Babcock* will be followed, but the following presumptions will prevail.

(a) Unless the law of the situs thwarts some elemental concept of fairness embodied in the law of the forum, it will be applied to all questions of liability for the tort, as the resolution of such questions would effect the conduct of persons within the jurisdiction of the government in whose territory the tort occurred; but

(b) All questions relating to the division or extent of damages to be assessed against the tortfeasor will be decided according to the law of the forum, as the government of the situs could have no possible interest in financial transactions between persons who owe it no allegiance and to whom it owes no duty of protection.

 We now turn to the matter before us. Since neither party has supplied us with any information as to what relevant Mexican law might provide, we are in no position to apply the foregoing in guidelines. However, it seems probable that Mexican law—unless it turns out to be in some way grossly unfair—would (if it any way conflicted with New York law) govern all questions of liability, while New York law would control all questions of damages.

### CONCLUSION

Defendant's motion for summary judgment is denied; and final resolution of the choice of law question is left to another day.

**SO ORDERED.**