**Dennis CURLEY, Plaintiff–Appellant–
Cross–Appellee,**

v.

**AMR CORPORATION; F.A. Kummire,
Capt.; Humberto Dueñas,
Defendants,**

---

6

American Airlines, Inc., Defendant–
Appellee–Cross–Appellant.

Nos. 96–9690, 97–7020.

United States Court of Appeals,
Second Circuit.

Argued Dec. 8, 1997.

Decided July 22, 1998.

Martin J. Birn, New York City, for Plaintiff–Appellant–Cross–Appellee.

Jeffrey J. Ellis, Quirk and Bakalor, P.C., New York City (Donna H. Bakalor, of counsel), for Defendant–Appellee–Cross–Appellant.

Before MINER, PARKER and WOOD,* Circuit Judges.

MINER, Circuit Judge.

Plaintiff-appellant-cross-appellee Dennis Curley appeals from a judgment entered in the United States District Court for the Southern District of New York (Knapp, J.) insofar as it incorporates an order granting summary judgment in favor of the defen-

---

* The Honorable Harlington Wood, Jr., of the United States Court of Appeals for the Seventh Circuit, sitting by designation.

dant-appellee-cross-appellant American Airlines, Inc. ("American"). In granting summary judgment, the district court applied New York law to dismiss claims of negligence and false imprisonment asserted by Curley against American. American cross-appeals from the same judgment insofar as it incorporates a putative order denying its motion for summary judgment to dismiss Curley's claims on the basis of Mexican law.

Applying Mexican law, we affirm the summary judgment entered in favor of American and dismiss the cross-appeal.

## BACKGROUND

The material facts in this case are undisputed. On December 25, 1990, Dennis Curley and a companion were passengers on two connecting American Airlines flights. The first was from New York City to Dallas–Fort Worth, Texas, and the second from Dallas–Fort Worth to Puerto Vallarta, Mexico. During the descent of the aircraft during the latter flight, several of American's flight attendants reported to the flight's captain, F.A. Kummire, that an odor of marijuana smoke was emanating from a lavatory that Curley had just vacated. The attendants also reported that they had found what appeared to be marijuana residue in the lavatory trash, and ashes or seeds in the lavatory sink. Despite their observations, an operable smoke detector in the lavatory was not activated during the flight. The attendants did not question or search Curley.

After learning of the flight attendants' observations and suspicions, the captain had the crew lock the lavatory for the duration of the flight. The captain did not inspect the lavatory or order that Curley be investigated or questioned and did not inquire as to whether Curley had actually been seen smoking marijuana. The captain kept the door locked until American was later notified by the Mexican authorities that they did not wish to inspect the lavatory.

After landing in Puerto Vallarta, the captain identified Curley for American's ground crew as a person suspected of having smoked marijuana in the lavatory during the flight. The ground crew then informed Mexican authorities of this suspicion. While awaiting immigration processing, Curley was approached by an employee of American named Humberto Dueñas, who asked Curley how long he planned to be in Mexico. After receiving this information, Dueñas left the immigration area, returning shortly thereafter with a Mexican official. At that point, Dueñas requested that Curley show him his plane ticket. Curley handed Dueñas all of his travel documents, including his passport. Dueñas and the Mexican official then left the area with Curley's travel documents. When they returned, Dueñas touched Curley's elbow and stated, "[C]ome with me please," indicating to Curley that he should accompany them to another location. Curley testified that, despite his failure to raise an objection at that time, he did not feel that he was going with Dueñas and the Mexican official voluntarily.

Dueñas and the official walked Curley to an office. Dueñas then told Curley to enter a smaller interior office, where two other Mexican officials were waiting. Neither Dueñas nor any other American employees entered the inner office. Once inside, Curley was questioned about his alleged use of marijuana, and his bags were searched. Curley testified that, based on gestures made by the officials, he knew that he was required to undress. Curley then undressed and underwent a strip search. He alleges that the officials who conducted the search laughed at him, threatened him with incarceration, pointed a loaded rifle at his genitals and touched his buttocks with the rifle. Curley asserts that they also repeatedly asked him where he was hiding the marijuana and stated that the captain had informed them that he had been smoking marijuana on the flight. Curley denied using or possessing marijuana. While he was being interrogated and examined, the officials continued unpacking his luggage in search of marijuana.

Although no evidence of marijuana was found in his luggage or on his person, a Mexican doctor was brought into the inner office to examine Curley to determine whether he had recently used marijuana. The doctor smelled Curley's breath and examined his eyes and the inside of his mouth. The

doctor also had Curley walk in a straight line and then touch his nose with his hands. The doctor concluded that Curley "exhibited alcohol intoxication of the 1st degree without exhibiting Cannabis intoxication." Curley admits to having had one beer on the flight. Although the physical exam by the doctor was requested by a Mexican official, Dueñas was required to pay the doctor's bill. After the medical examination was completed, Curley repacked his luggage. He and his companion were cleared through immigration without incident at the conclusion of the investigation. According to Dueñas' report, proper security procedures were followed.

On June 28, 1991, Curley filed a complaint in the United States District Court for the Southern District of New York, alleging, *inter alia*, that he was harmed as a result of the captain's failure to fully investigate, or have the crew investigate, his suspected marijuana use and possession prior to the report of that suspicion to the Mexican authorities. Curley contends that the captain had a duty to investigate or order an investigation, presumably because he would not have been detained by Mexican officials when the investigation revealed that he did not use or possess marijuana. Consequently, Curley claims that American's failure to investigate constitutes actionable negligence and gross negligence under New York law.

Curley also alleges that American, primarily through the actions of Dueñas, caused Curley to be falsely imprisoned by Mexican officials in violation of New York law. Curley claims that he was humiliated by this ordeal and has suffered anxiety, anger, deterioration of his relationship with his lover and flashbacks. As a result of the physical and emotional harm claimed to have been caused by American's alleged wrongdoing, Curley seeks both compensatory and punitive damages from American in the amount of $1,000,000.

American first moved for summary judgment by notice of motion dated March 26, 1993. The relief sought was stated in the notice of motion in the following language: "[T]he defendant ... will move for summary judgment on the ground that the Warsaw Convention governs plaintiff's action and pre-cludes recovery for the type of injury which he alleges. Alternatively, defendant moves for the application of Mexican law."

By opinion and order dated March 7, 1994, the district court denied American's motion for summary judgment, finding that Curley's claim was not based on an "accident" of the type contemplated by the Warsaw Convention. *See Curley v. American Airlines, Inc.*, 846 F.Supp. 280, 283 (S.D.N.Y.1994). The district court also observed that Curley's state law claim was not preempted by the Federal Aviation Act, inasmuch as the preemptive provisions of the Act related only to rates, routes and services. *Id.* at 284. As to the alternative relief sought in the motion, the district court found the parties' submissions inadequate: "[N]either party has supplied us with any information as to what relevant Mexican law might provide." *Id.* at 285. Accordingly, the district court "left to another day" the "final resolution of the choice of law question." *Id.* at 285.

Following briefing and oral argument on Mexican law by the parties, the district court issued a Memorandum and Order dated May 11, 1995 denying the alternative motion for the application of Mexican law. *See Curley v. American Airlines, Inc.*, No. 91 Civ. 2724, 1995 WL 276138 (S.D.N.Y. May 11, 1995). The district court stated: "We find nowhere in defendant's recitation of Mexican law an explanation of how these laws are inconsistent with similar provisions of New York law. Indeed, plaintiff suggests—and we agree—that they are entirely consistent with New York law." *Id.* 1995 WL 276138 at *1. The district court further stated that, even if it were wrong in its conclusion, "we would still be inclined to deny defendant's motion on the ground that defendant has not presented us with a sufficiently comprehensive statement of Mexican law to permit us to act upon it with confidence." *Id.* 1995 WL 276138 at *2. Accordingly, the district court determined that "New York law will be applied to all issues of liability and damages." *Id.*

American's second motion for summary judgment was made on the basis of New York law. Oral argument on the motion was heard on October 18, 1996, and the district court issued an Memorandum and Order

granting summary judgment on November 14, 1996. *See Curley v.. American Airlines, Inc.*, No. 91 Civ. 2724, 1996 WL ·668857 (S.D.N.Y. November 19, 1996). Applying New York law in rejecting plaintiff's claim of false imprisonment, the district court found that "[t]here [was] nothing in Duenas' conduct to suggest that he had any control over the conduct and decisions of the Mexican authorities, or that he in any way suggested to them what should be done." *Id.* 1996 WL 668857 at *2. The district court did not address plaintiff's negligence claim in the memorandum and order, apparently having rejected that claim in the course of oral argument. This appeal and cross-appeal followed the entry of final judgment on November 20, 1996.

## DISCUSSION

### I.  *The Cross–Appeal*

■ At the outset, we note our lack of jurisdiction over the cross-appeal filed by American. The cross-notice of appeal gives notice of an appeal from the order "dated and filed on May 10, 1995 which denied defendant's motion for summary judgment on the basis of Mexican law and/or treaty." The order of May 10 (actually May 11) in fact does not deny summary judgment. It merely rejects the application of Mexican law in this case. The order specifically provides that New York law would be applied to issues of liability and damages to be resolved in the future. Moreover, the motion to which the order responds did not seek summary judgment on the basis of Mexican law. It sought summary judgment on the basis of the Warsaw Convention. The alternative relief requested, and subsequently denied after further briefing and argument, was the application of Mexican law to future proceedings in this case. As will be seen, we do apply Mexican law to affirm the summary judgment granted to American. However, we are constrained to dismiss the cross-appeal because there simply is no order dated May 10 (or May 11) denying a motion for summary judgment. *See* Fed.R.App.P. 3(c) ("A notice of appeal ... must designate the judgment, order, or part thereof appealed from.").

### II.  *The Appeal*

#### A.  *Standards of Review*

■ The district court's choice of law determination concerned a matter of law, and therefore we review it *de novo. See Sheldon v. PHH Corp.*, 135 F.3d 848, 852 (2d Cir. 1998); *see also General Ceramics Inc. v. Firemen's Fund Ins. Cos.*, 66 F.3d 647, 651 (3d Cir.1995) ("application of ... choice-of-law rules involves the application of legal principles and therefore is subject to plenary review"). Likewise, pursuant to Fed. R.Civ.P. 44.1, a court's determination of foreign law is treated as a question of law, which is subject to *de novo* review. *See Seetransport Wiking Trader Schiffahrtsgesellschaft MBH & Co. v. Navimpex Centrala Navala*, 29 F.3d 79, 81 (2d Cir.1994).

■ We review a grant of summary judgment *de novo* to ascertain whether the substantive law was properly applied and, viewing the evidence in the light most favorable to plaintiff, to determine whether there are genuine issues of material fact necessitating a trial. *See, e.g., King v. Crossland Savings Bank*, 111 F.3d 251, 256 (2d Cir. 1997). "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." *Taggart v. Time Inc.*, 924 F.2d 43, 46 (2d Cir.1991) (citation and quotation omitted). Summary judgment is appropriate when the non-moving party has not set forth facts that relate to a necessary element of a claim. *King*, 111 F.3d at 259–60 (holding that the district court properly granted summary judgment in favor of defendant because plaintiff failed to set forth material issues of fact with respect to defendant acting unreasonably to support plaintiff's negligence claim under New York law).

For the reasons that follow, we think that the district court was mistaken in its choice of law determination and that Mexican, rather than New York, law applies in this case. Applying Mexican law, we affirm the summary judgment dismissing plaintiff's claims against American Airlines.

### B. *Choice of Law*

In diversity jurisdiction cases such as this,[1] it is well settled that a federal court must look to the choice of law rules of the forum state. *See Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir.1996). In New York, the forum state in this case, the first question to resolve in determining whether to undertake a choice of law analysis is whether there is an actual conflict of laws. *See Matter of Allstate Ins. Co. and Stolarz*, 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 613 N.E.2d 936 (1993). It is only when it can be said that there is no actual conflict that New York will dispense with a choice of law analysis. *See J. Aron & Co. v. Chown*, 231 A.D.2d 426, 647 N.Y.S.2d 8 (1st Dept.1996) (no conflict between law of New York and law of Newfoundland). Where the applicable law from each jurisdiction provides different substantive rules, a conflict of laws analysis is required. *See Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 14 (2d Cir.1996) (holding that there was an actual conflict where, with respect to damages, Ohio law allowed for consideration of loss of society but New York law did not); *Bader v. Purdom*, 841 F.2d 38, 39–40 (2d Cir.1988) (holding that there was an actual conflict where jurisdictions differed with respect to the availability of recovery under a theory of negligent parental supervision).

In tort actions, if there is a conflict of laws, New York courts apply an "interests analysis," under which the law of the jurisdiction having the greatest interest in the litigation is applied. *AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 266, 270 (2d Cir.1992); *see also Babcock v. Jackson*, 12 N.Y.2d 473, 481, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963). "In deciding which state has the prevailing interest, we look only to those facts or contacts that relate to the purpose of the particular laws in conflict. 'Under this formulation, the significant contacts are, almost exclusively, the parties domiciles and the locus of the tort.' " *AroChem Int'l*, 968 F.2d at 270 (quoting *Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189, 197, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985)). "If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72, 595 N.Y.S.2d 919, 612 N.E.2d 277 (1993). If the choice of law analysis leads to the application of foreign law, a court may refuse to apply that law only if its application would be violative of fundamental notions of justice or prevailing concepts of good morals. *Brink's Ltd. v. South African Airways*, 93 F.3d 1022, 1031 (2d Cir.1996); *cert. denied*, — U.S. —, 117 S.Ct. 959, 136 L.Ed.2d 845 (1997). The public policy of the forum thus provides an exception to application of foreign law only for law "truly obnoxious" to that policy. *Id.*

In answering the first question in the New York choice of law analysis, the district court, relying solely on the submissions and arguments of the parties, determined that American had failed to identify a material conflict between the applicable New York and the applicable Mexican law. In fact, based on those submissions, the district court found the laws "entirely consistent." *Curley*, 1995 WL 276138 at *1. However, the district court noted that even if its choice of law decision were incorrect, American had failed to present adequately a comprehensive statement of Mexican law to allow the district court to apply it to the case. We agree that the presentations of Mexican law by the parties were insufficient to allow a proper choice of law analysis. As a result, we requested further briefings by both sides after oral argument and we conducted our own research on Mexican law. In doing so, we manifested our agreement with the concept that appellate courts, as well as trial courts, may find and apply foreign law. *See Twohy v. First Nat'l Bank of Chicago*, 758 F.2d 1185, 1192–94 (7th Cir.1985); *see generally* 9 Charles Alan Wright & Arthur R. Miller,

---

1. There is no dispute that there is diversity jurisdiction in this case, as Curley is a citizen of the State of New York and American is incorporated in Delaware and has its principal place of business in Texas. Moreover, Curley seeks $1,000,-000 in compensatory and punitive damages exclusive of costs and attorney's fees. *See* 28 U.S.C. § 1332.

Federal Practice and Procedure §§ 2444–446 at 644–58 (3d ed.1995).

■ The district court need not have avoided a full analysis of Mexican law simply on the basis of an inadequate submission by one party. Fed.R.Civ.P. 44.1 allows district courts to determine foreign law through consideration of "any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." We urge district courts to invoke the flexible provisions of Rule 44.1 to determine issues relating to the law of foreign nations. Such issues can be expected to come to the federal courts with increasing frequency as the global economy expands and cross-border transactions increase. *See* Roger J. Miner, *The Reception of Foreign Law in the U.S. Federal Courts;* 43 Am.J.Comp.L. 581 (1995); Milton Pollack, *Proof of Foreign Law,* 26 Am. J.Comp.L. 470 (1978); 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2444 at 644–54 (3d ed.1995).

■ Our examination of Mexican law reveals clear conflicts with New York law as it pertains to the case before us. The complaint is pleaded under common law concepts of false imprisonment, negligence and gross negligence. The rules establishing these causes of action are well-settled under New York law, and the elements of the causes have been clearly defined.

■ To establish a *prima facie* case of negligence under New York law, three elements must be demonstrated: (1) the defendant owed the plaintiff a cognizable duty of care as a matter of law; (2) the defendant breached that duty; and (3) plaintiff suffered damage as a proximate result of that breach. *See McCarthy v. Olin Corp.,* 119 F.3d 148, 156 (2d Cir.1997); *see also Stagl v. Delta Airlines, Inc.,* 52 F.3d 463, 467 (2d Cir.1995). A common carrier such as an airline generally owes its passengers a duty of reasonable care under the circumstances. *See Rainey v. Paquet Cruises, Inc.,* 709 F.2d 169, 170–71 (2d Cir.1983); *Gerard v. American Airlines, Inc.,* 272 F.2d 35, 36 (2d Cir.1959); *Krasnow v. National Airlines, Inc.,* 228 F.2d 326, 328 (2d Cir.1955); *O'Leary v. American Airlines,*

100 A.D.2d 959, 475 N.Y.S.2d 285, 287 (2d Dept.1984). This duty requires the common carrier to exercise care "which a reasonably prudent carrier of passengers would exercise under the same circumstances, ·in keeping with the dangers and risks known to the carrier or which it should reasonably have anticipated." *Lesser v. Manhattan and Bronx Surface Transit Operating Auth.,* 157 A.D.2d 352, 556 N.Y.S.2d 274, 276 (1st Dept. 1991) (quotation and citation omitted).

■ Like ordinary negligence, gross negligence also involves "the commission or omission of an act or duty owing by one to another." 79 N.Y.Jur.2d *Negligence* § 37 (1989). However, "the act or omission must be of an aggravated character, as distinguished from the failure to exercise ordinary care." *Id.* In other words, gross negligence "is conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing." *AT & T Co. v. City of New York,* 83 F.3d 549, 556 (2d Cir.1996) (quotation and citation omitted).

■ "False imprisonment is an unlawful detention contrary to the will of the person detained, accomplished with or without process of law." 59 N.Y.Jur.2d *False Imprisonment* § 1 (1987). A prima facie case of the intentional tort of false imprisonment is established upon a showing that: (1) the defendant intended to confine the plaintiff; (2) the plaintiff did not consent to the confinement; (3) the plaintiff was aware that he was confined; and (4) the confinement was not otherwise privileged, such as confinement pursuant to a warrant or with probable cause or immunity protection. *See King,* 111 F.3d at 256–57; *Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir.1995); *see also* 59 N.Y.Jur.2d *False Imprisonment* §§ 22–46 (1987) (providing a review of what may cause a confinement to be privileged).

■ For false imprisonment liability to attach to one who causes or directs an arrest or imprisonment in New York, "[t]he defendant must have affirmatively induced the officer to act, such as taking an active part in the arrest and procuring it to be made or showing active, officious and undue zeal to

the point where the officer is not acting of his own volition." *Id.* at § 37; *see also King,* 111 F.3d at 257 (holding that defendant must have "intended or instigated the confinement of the plaintiff"); *Raysor v. Port Auth. of N.Y. and N.J.,* 768 F.2d 34, 39 (2d Cir.1985) (holding that there must be "an unequivocal complaint or request to arrest" in order for a third-party to be liable for false arrest by the police).

Mexican law is much different, and its sources do not lie in precedent cases. As a civil law jurisdiction, Mexican courts consider the text of the constitution, civil code and statutory provisions as the primary source of law and give them preponderant consideration. *See* Boris Kozolchyk and Martin L. Ziontz, *A Negligence Action in Mexico: An Introduction to the Application of Mexican Law in the United States,* 7 Ariz.J. Int'l & Comp.L. 1, 8 (1989). Likewise, Mexican courts give substantial weight to administrative regulations. *See id.* "Civil law codes tend to be much more general and encompass a broader range of circumstances than do common law statutes.... A civil code. is not a list of special rules for particular situations; it is rather a body of general principles carefully arranged and closely integrated." Margarita Trevino Balli and David S. Coale, *Torts and Divorce: A Comparison of Texas and the Mexican Federal District,* 11 Conn.J. Int'l L. 29, 42 (1995); *see also* Ryan G. Anderson, *Transnational Litigation Involving Mexican Parties,* 25 St. Mary's L.J. 1059, 1095 (1994) (describing the Mexican civil law system). New York courts do not indulge the presumption that New York law is the same as the law of a civil code country. *Loebig v. Larucci,* 572 F.2d 81, 85 (1978). It is only when no evidence of foreign law has been presented that the courts will decide cases in accordance with New York law. *Id.* Such is not the situation here.

Under the Mexican Civil Code, specific common law torts are not recognized. Instead, the noncontractual civil wrongs that we characterize as the torts of false imprisonment, negligence and gross negligence are encompassed in one general Article in the Mexican Civil Code. That Article is found in Chapter V ("Liabilities from Illicit Acts") of Book Four ("Obligations") of the Code and provides:

> Whoever, by acting illicitly or against the good customs and habits, causes damage to another shall be obligated to compensate him unless he can prove that the damage was caused as a result of the fault or inexcusable negligence of the victim.

Mexican Civil Code, art. 1910 (Abraham Eckstein and Enrique Zepeda Trujillo trans. 1996).

As is apparent, the potential for liability is somewhat open-ended, since an illicit act may be a violation of "good customs" as well as a violation of a statute or administrative regulation. *See* Boris Kozolchyk and Martin L. Ziontz, *A Negligence Action in Mexico: An Introduction to the Application of Mexican Law in the United States,* 7 Ariz.J. Int'l & Com.L. 1, 11 (1989).

> A finding on good customs, by its very nature, requires a flexible approach to the admissibility of evidence, the method of proof, and discretion of the trier of fact. In theory, good customs could be proven by as many evidentiary devices as may be concocted by a fertile imagination, from the interpretation of theological or religious injunctions on bad behavior to anthropological, sociological or psychological expert testimony on prevailing attitudes. Such a broad spectrum of proof presupposes that the trier of fact has the legal training necessary to exercise sound discretion. If the trier of fact is a professional judge, as he is in Mexico, he will try, at least ostensibly, to rely not on his own knowledge and experience but on that of witnesses, particularly expert witnesses.

*Id.*

Whether the wrongful act was intentional or negligent does not have a distinct bearing on liability. The primary focus for liability purposes is simply whether the act was illicit or against good customs and, if so, whether the wrongdoer was at fault for causing another person injury by his wrongdoing. *See* Margarita Revino Balli and David S. Coale, *Torts and Divorce: A Comparison of Texas and the Mexican Federal District,* 11 Conn.J. Int'l L. 29, 46 (1995). Consideration

of whether the wrongful act was intentional or negligent is only relevant as a factor to be included in the formulation of the compensatory and "moral" damages awards. *See id.* When liability has been found and damages are at issue, non-physical injuries such as emotional harm can be compensable and "shall be presumed if a person's freedom . . . or integrity is unlawfully violated or restricted." Mexican Civil Code, art. 1916.

■ We deal here with conduct regulating rules that are in actual conflict due to the differences between common law and civil law requirements for establishing tort liability. Accordingly, we find it necessary to apply the law of Mexico, which has the greatest interest in regulating the behavior of the parties to this appeal and which is the locus of the alleged tort. In doing so, we find in the pertinent law no violation of fundamental notions of justice and good morals and no threat to the public policy of the forum.

## C. *Application of Mexican Law*

■ It seems clear to us from the undisputed facts that American Airlines and its employees cannot be considered to have acted illicitly or against good customs and habits. For this reason, the plaintiff's claim cannot survive American's motion for summary judgment.

■ Rather than acting in a manner contrary to the standards set forth in the pertinent Civil Code provision, American's employees acted in strict compliance with specific regulatory requirements governing the conduct and operation of aircraft in Mexican airspace. Without question, Mexico has sovereign jurisdiction over its own airspace. *See* Ley de Vias Generales de Communicacion, Libro Cuatro, Articulo 306 (Mex.), *translated in* Staff of Senate Comm. on Commerce, 89th Cong., 1st Sess., Air Laws and Treaties of the World, 1, 1721 (Comm. Print 1965) (hereinafter "Communications Law") (Translation of Communications Law is found at pp. 1721–43); *see also* Chicago Convention, 15 U.N.T.S. 21, art. 1 ("The contracting states recognize that every State has complete and exclusive sovereignty over the airspace above its territory."). Moreover, the Mexican federal government has exclusive jurisdiction over issues relating to the "inspection, supervision and control of civil air navigation, [including] all civil aircraft in Mexican territory or which fly over it, as well as their crew, passengers and goods transported." Communications Law, art. 308.

The United States has recognized this jurisdiction by international convention and treaty. According to Article 5B of the Agreement between the Government of the United States of America and the Government of the United Mexican States, August 15, 1960, T.I.A.S. No. 4675, and Article 13 of the Convention on International Civil Aviation, December 7, 1944, T.I.A.S. No. 1591, 15 U.N.T.S. 21, a United States airline is required to respect Mexican law governing commercial air travel while operating in Mexico. *See, e.g., Barkanic v. General Admin. of Civil Aviation of the People's Republic of China,* 923 F.2d 957, 961 (2d Cir.1991) (holding that the Agreement between the Government of the United States and the Government of the People's Republic of China Relating to Civil Air Transport, September 17, 1980, T.I.A.S. No. 10326, art. 5, requires "that a United States airline must respect Chinese laws when operating within Chinese territory").

Pilots in command of aircraft operating in Mexico are responsible for the "directi[on], care, order and safety of the aircraft, the crew, [and] passengers . . . . [until] . . . the end of the flight ." Communications Law, art. 321. Article 322 of the Communications Law requires the pilot in command to log and make known to Mexican federal authorities upon landing in Mexico "all incidents which might have legal consequences and which take place during the flight ." It is clear that bringing narcotics into Mexico is an "incident" that "might have legal consequences." A pilot's duty to report suspected in-flight drug use or possession is further established by Article 556 of the Communications Law, which provides that a pilot may be subject to fines for "acts or omissions which, actively or passively, contribute to the act of smuggling."

American's submissions following oral argument included an affidavit by Eduardo Ramos Gomez, who is an attorney licensed to practice in Mexico and a registered foreign legal consultant in the State of New York. Attached to this affidavit were copies of certain provisions of the Codigo Penal para el Distrito Federal or Mexican Penal Code, including Articles 5 and 194, in both the original Spanish version and Mr. Gomez's English translation. The parties do not dispute the accuracy of these provisions or the illegality of importing marijuana into Mexico. Article 194 of the Mexican Penal Code provides that one who "[b]rings in ;... narcotics ... even if it is momentarily or while in transit" is subject to a term of imprisonment of tip to 25 years. Article 5 of the Mexican Penal Code specifically provides that acts on flights in Mexican airspace are considered to be committed in Mexico for penal code purposes.

Neither the parties' submissions of Mexican law nor our own research have uncovered any law that could be read to require a commercial airline pilot or crew to question or search any passenger suspected of inflight drug use or possession prior to reporting the suspicion to the authorities. Curley's contention that there is such a duty therefore is without foundation. The obligation of the captain to report suspected drug importation can be performed by those who act at his direction. Here, Captain Kummire identified Curley for the American ground crew as one suspected of possessing and using marijuana in the lavatory while in Mexican airspace. The ground crew notified the Mexican authorities. All of this was in furtherance of the captain's obligation to report occurrences that *might* result in a legal action.

Under the circumstances, it was reasonable for the captain, as well as the Mexican authorities, to suspect that Curley was bringing at least some quantity of marijuana into Mexico. The part played by Dueñas was merely a continuation of the discharge of the responsibilities imposed upon the captain. Dueñas acted routinely in assisting the Mexican officials with identification and processing matters prior to the official search and examination of Curley. Accordingly, neither his activities nor the act of any American employee can in any way be considered illicit or contrary to good habits and customs in Mexico.

## CONCLUSION

We have considered all of Curley's contentions on this appeal and have determined, in accordance with the foregoing, that the summary judgment granted to American should be affirmed on the basis of Mexican law. For the reasons previously given, we dismiss the cross-appeal from the putative order denying the motion for summary judgment that was grounded in Mexican law.