**DEALTIME.COM LTD., Plaintiff,**

v.

**Robert J. McNULTY, Defendant.**

**No. 00 CIV 3854 (RWS).**

United States District Court,
S.D. New York.

Dec. 13, 2000.

Whitman Breed Abbott & Morgan, New York City, By Charles W. Pieterse, Michael J. Friedman, of counsel, for Plaintiff.

Akin, Gump, Strauss, Hauer & Feld, New York City, By Steven M. Pesner, Nancy Chung, Sapna Mirchandani, of counsel, Rutan & Tucker, Costa Mesa, CA, Richard K. Howell, Steven J. Goon, of counsel, for Defendant.

## OPINION

SWEET, District Judge.

Plaintiff DealTime.com Ltd. ("Deal-Time") has moved to dismiss the Fourth and Fifth Counterclaims of Defendant Robert J. McNulty ("McNulty") for failure to state a claim upon which relief may be granted, pursuant to Rule 12(b)(6), Fed. R.Civ.P. Also pending is McNulty's motion to transfer the case to the Central District of California, Southern Division, pursuant to 28 U.S.C. § 1404(a). For the reasons set forth below, McNulty's motion to transfer is denied, and DealTime's motion to dismiss is granted.

### The Parties

DealTime is a corporation organized under the laws of Israel, with a principal place of business in Israel. Among other enterprises, DealTime provides a free comparison online shopping service that lists online merchants, auctions, classifieds and group buying sites that offer products matching its users' shopping criteria.

McNulty is a resident of Newport Beach, California who founded several internet retailing businesses, and briefly served as a consultant and outside director to DealTime.

### Background

This action arises out of McNulty's alleged failure to disclose pertinent facts to DealTime before it accepted him as a consultant and outside director. Specifically, DealTime alleges that McNulty never advised that he has been the subject of several Securities and Exchange Commission ("SEC") investigations and an SEC civil enforcement action, is a named defendant in several pending lawsuits alleging federal and state securities law violations, and is allegedly under a contractual obligation with a major computer manufacturer not to work for, consult for, or become a five percent investor in any company that does business on or through the internet without prior approval.

McNulty met twice with DealTime executives prior to February 1999, once in California and once in New York, where they discussed possible mutually beneficial business ventures. At a lunch with DealTime executives in New York on February 22, 1999, McNulty wrote a check for $250,000 as an "equity investment" in DealTime. In the subsequent weeks, DealTime informed McNulty that although the Series "B" DealTime shares that had been discussed on February 22, 1999 were no longer available, McNulty would be "made whole" by receiving stock options at the Series B pricing level in connection with a Board of Directors and consulting options package.

Under this restructured deal, McNulty would receive 500,000 DealTime adjusted dividend stock options in Dealtime for his investment, approximately 357,143 of which were presently exercisable to convert McNulty's equity investment, with the remainder exercisable over his three-year term as a consultant and outside director. During the restructuring of the deal, DealTime's President and CEO, Daniel Ciporin ("Ciporin"), made at least two trips to California to meet with McNulty and others.

The parties memorialized the agreement by a letter executed in May of 1999, but backdated to February 22, 1999 (the "Agreement"), which made no reference to any vesting schedule for the 500,000 options.

Approximately three weeks after the Agreement was signed, on June 7, 1999, McNulty arrived at a DealTime Board of Directors meeting only to discover that he was no longer a member of the Board, because the controversy about McNulty's prior investigation by the SEC had created problems for DealTime's ongoing financing efforts.

In response to McNulty's subsequent inquiries about the remaining options that had not yet been issued to him, DealTime's General Counsel e-mailed McNulty a statement to the effect that:

> Since you already paid $250,000, we will treat this as an exercise of the option as to 357,143 shares and will issue them by resolution of the board at its August 12 meeting, and I will have a warrant to give you which will cover the remaining 142,857 options that remain unexercised.

Def. Trans. Mtn. Ex. G (July 14 Katzen e-mail). And, at the August 12, 1999 meeting, the Board adopted the following resolution:

> RESOLVED to issue and allocate to Robert McNulty 357,143 Series B Preferred Shares in accordance with a notice of partial exercise of options received by the Company, payment for

which the sum of $250,000 having been fully received.

*Id.* Ex. H ¶ 17.

When McNulty further pursued the question of the remaining shares, he was informed that his options had never vested because his involvement with DealTime had been terminated. In May of 2000, after repeated attempts to receive the balance of options, McNulty advised Deal-Time's general counsel that he was prepared to file a lawsuit if the options were not forthcoming. McNulty's attorney sent another letter to the same effect on May 9, 2000. After suggesting that they explore non-litigation resolutions, Dealtime notified McNulty of its own potential legal claims and filed this action the same day, on May 22, 2000.

DealTime seeks, *inter alia*, rescission of the contract and a declaratory judgment that it was not responsible to pay McNulty the balance of 142,857 stock options now claimed due. McNulty contends that he did disclose all relevant information about the SEC investigations and construes this action as a preemptive strike DealTime filed in order to avoid issuing the balance of stock due under the agreement. McNulty filed six counterclaims, the fourth and fifth of which assert common law fraud and federal securities fraud.

By motion of July 13, 2000, DealTime sought to dismiss these claims as duplicative of McNulty's breach of contract counterclaims. McNulty filed a response on August 22, 2000, and DealTime filed a reply brief on September 12, 2000. The motion was deemed fully submitted on September 27, 2000.

Meanwhile, McNulty filed a transfer motion on September 7, 2000, alleging that the case was more properly brought in the Central District of California, where he resides. DealTime responded on September 29, 2000, and McNulty replied on October 6, 2000. The motion was deemed fully submitted upon oral argument on October, 11, 2000.

## Discussion

### I. The Standard for Transfers Under Section 1404(a)

Section 1404(a) of Title 28 of the United States Code provides in relevant part that:

for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

28 U.S.C. § 1404(a). This section is a statutory recognition of the common law doctrine of *forum non conveniens* as a facet of venue in the federal courts. *See DiRienzo v. Philip Services Corp.,* 232 F.3d 49 (2d Cir.2000); *Wilshire Credit Corp. v. Barrett Capital Management Corp.,* 976 F.Supp. 174, 180 (W.D.N.Y. 1997). Section 1404(a) strives "to prevent the waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Van ·Dusen v. Barrack,* 376 U.S. 612, 616, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964) (citation and internal quotations omitted); *see Ferens v. John Deere Co.,* 494 U.S. 516, 522, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990).

" '[M]otions for transfer lie within the broad discretion of the courts and are determined upon notions of convenience and fairness on a case-by-case basis.' " *Linzer v. EMI Blackwood Music Inc.,* 904 F.Supp. 207, 216 (S.D.N.Y.1995) (*quoting In re Cuyahoga Equip. Corp.,* 980 F.2d 110, 117 (2d Cir.1992)) (*citing Stewart Organization, Inc. v. Ricoh Corp.,* 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988)); *see Piper Aircraft Company v. Reyno,* 454 U.S. 235, 257, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). The burden of demonstrating the desirability of transfer lies with the moving party. *See, e.g., Hubbell Inc. v. Pass & Seymour, Inc.,* 883 F.Supp. 955, 962 (S.D.N.Y.1995).

Thus, the inquiry on a motion to transfer is two-fold. The court must first determine whether the action sought to be

transferred is one that "might have been brought" in the transferee court. Second, the court must determine whether, considering the "convenience of parties and witnesses" and the "interest of justice," a transfer is appropriate. *Wilshire*, 976 F.Supp. at 180.

■ In determining whether transfer is warranted, courts generally consider several factors, including: (1) the convenience of witnesses, (2) the convenience of the parties, (3) the locus of operative facts, (4) the availability of process to compel the attendance of unwilling witnesses, (5) the location of relevant documents and the relative ease of access to sources of proof, (6) the relative means of the parties, (7) the forum's familiarity with the governing law, (8) the weight accorded the plaintiff's choice of forum, and (9) trial efficiency and the interest of justice, based on the totality of the circumstances. *See Dostana Enterprises LLC v. Federal Express Corporation*, No. 00 Civ. 0747(RWS), 2000 WL 1170134, *2 (S.D.N.Y. Aug.16, 2000); *Citigroup Inc. v. City Holding Co.*, 97 F.Supp.2d 549, 560–61 (S.D.N.Y.2000); *Cento Group, S.p.A v. OroAmerica, Inc.*, 822 F.Supp. 1058, 1060 (S.D.N.Y.1993).

## II. Transfer is Not Warranted

### A. This Action Could Have Been Brought in the Central District of California

An action "could have been brought" in another forum if the defendant would have been amendable to personal jurisdiction in the transferee forum at the time the action was commenced and if venue is proper there. *See Dostana*, 2000 WL 1170134, at *2. DealTime concedes that both the requirements of personal jurisdiction and venue are met because McNulty resides in the Central District of California. *See* 28 U.S.C. § 1391(a)(1).

### B. The Balancing Factors Weigh Against Transfer

Consideration of the balancing factors, discussed below, leads to the conclusion that transfer is not warranted.

### 1. The Convenience of Witnesses

■ The convenience of both party and non-party witnesses is a key factor in a 1404(a) analysis. *See Dostana*, 2000 WL 1170134, *3. In evaluating this factor, the court should "look beyond the quantity of witnesses and assess the quality of the testimony to be offered." *American Alliance Ins. Co. v. Sunbeam Corp.*, No. 98 Civ. 4703, 1999 WL 38183, at *1 (S.D.N.Y. Jan.28, 1999) (internal quotation omitted). A party seeking to rely on the convenience of the witnesses factor must identify the material witnesses and supply a general description of what their testimony will cover. *See Robomatix Int'l, Inc. v. Aluminum Co. of America*, No. 92 Civ. 6281, 1993 WL 183776, at *2 (S.D.N.Y. May 20, 1993).

■ McNulty has identified four witnesses, at least three of which reside in the Central District of California, Southern Division, as defense witnesses. In addition to McNulty himself, three "non-party" witnesses, Michelle LaRue ("LaRue"), Frank Denny ("Denny"), and Pat DiMicco, ("DiMicco"), are expected to testify to various aspects of McNulty's performance under the Agreement, his efforts to obtain the options and DealTime's responses, and the disclosures McNulty made to DealTime executives concerning his relevant background and experience as the subject of the SEC investigation.

DealTime alleges that none of these witnesses has first-hand knowledge of any relevant facts, so the convenience to them should not be considered. As McNulty has outlined the expected testimony of LaRue and Denny in only vague terms, they will not be considered as material witnesses whose convenience will affect the balancing inquiry. *See Dostana*, 2000 WL 1170134, *3; *Falconwood Financial Corp. v. Griffin*, 838 F.Supp. 836, 840–41 (S.D.N.Y.1993) (inconvenience to witness for whom substance of testimony not specified is not given weight).

However, McNulty does specify that DiMicco is expected to testify that he was present during a conversation in which McNulty discussed the prior SEC investigation with DealTime executives. In addition, McNulty's California-based attorney, Barry Falk, is expected to testify as to discussions leading up to the execution of the Agreement in May of 1999, and the parties' allegedly common understanding that McNulty's options were not subject to a vesting schedule. McNulty alleges that unless the case is transferred to California, he will be unable to compel his witnesses to appear and testify in the Southern District of New York. This argument carries somewhat more weight with regard to DiMicco, whose relationship to McNulty is unspecified, than it does with regard to McNulty's attorney, for obvious reasons.

DealTime has identified four individuals, including McNulty, as "crucial witnesses" who have first-hand knowledge of both the relevant meetings between the parties and subsequent discussions regarding McNulty's investment in and Board service with DealTime. Jeffrey Finkle ("Finkle"), is a principal of Odeon Capital and DealTime investor who resides in Connecticut and works at DealTime's Manhattan office. DealTime CEO, Daniel Ciporin ("Ciporin"), resides in Port Washington, New York, which is located in the Eastern District of New York for venue purposes. The significance of witnesses who reside in neither the current nor transferee forum is negligible at best. *See Wechsler*, 1999 WL 1261251, at *6 (declining to consider convenience of witnesses located outside both transferor and transferee forum); *Raines v. Switch Mfr'g Corp.*, No. 96 Civ. 1361, 1996 WL 413720, at *3 (S.D.N.Y. July 24, 1996) (dismissing plaintiff's argument for East Coast venue where none of its witnesses located in either forum and could be expected to travel in any case). Therefore, Finkle is not a relevant witness to this analysis.

Matthew Smith ("Smith"), a DealTime director, resides in Manhattan. DealTime has not alleged that Smith, an agent of DealTime, would be unwilling to travel to another forum to testify on DealTime's behalf.

The balance of convenience to non-party witnesses weighs slightly in favor of McNulty, who has at least one material witness residing in the proposed transferee venue.

### 2. The Convenience and Relative Means of the Parties

The convenience of the parties factor does not weigh in favor of transfer where such transfer would merely shift the inconvenience of litigating in a particular forum from one party to the other. *See Wechsler v. Macke Int'l Trade, Inc.*, No. 99 Civ. 5725(AGS), 1999 WL 1261251, *6 (S.D.N.Y. Dec.27, 1999) (parties' convenience a neutral factor if merely shifts inconvenience). However, where neither party resides in the chosen forum, "it is only logical that a transfer to the residence of one of them would be more convenient." *ZPC 2000, Inc. v. SCA Group, Inc.*, 86 F.Supp.2d 274, 279 (S.D.N.Y.2000). Here, DealTime is an Israeli corporation with some presence in New York, whereas the proposed transferee forum is the defendant's actual district of residence.

The relative means of the parties should also be considered in this factor. As McNulty is a private individual and DealTime is an international corporation, DealTime is better positioned to bear any financial inconvenience that might be incurred by transfer.

This factor weighs in favor of transfer.

### 3. The Locus of Operative Facts

The location of operative events giving rise to an action is a "primary factor" in determining a motion to transfer venue. *See Dostana*, 2000 WL 1170134, at *4; *ZPC 2000*, 86 F.Supp.2d at 279. While several meetings of the parties took place in California, and DealTime executives and attorneys contacted McNulty there, the

events with the most relevance to this action, the initial contact between McNulty and DealTime, where McNulty contends he disclosed all relevant information regarding the SEC action in early January 1999, and the February 22, 1999 lunch meeting at which McNulty wrote the $250,000 check that was the basis of the subsequent Agreement, took place in New York.

This factor weighs against transfer.

### 4. *The Availability of Compulsory Process*

 McNulty alleges that he would not be able to compel his witnesses to testify in the Southern District of New York, but that DealTime's witnesses could be compelled to testify in the Central District of California by virtue of their employment and agent status with the corporation. While this contention may be true with regard to DealTime's witnesses, it does not tip the balance in favor of transfer in light of the option of videotaping testimony of witnesses unwilling to travel. *See* Fed. R.Evid. 804(a)(5); *Citigroup Inc. v. City Holding Co.,* 97 F.Supp.2d 549, 561–62 (S.D.N.Y.2000).

The availability of compulsory process is a neutral factor in the transfer analysis.

### 5. *Location of Documents and Access to Proof*

Neither party argues that the location of documents and other proof is a relevant factor to the transfer analysis.

### 6. *Familiarity With Governing Law*

 To the extent this action raises questions of federal law, either forum is equally capable of hearing and deciding those questions. This case also raises state law issues. If, pursuant to a choice of law analysis, it is determined that these issues will be governed by the state law of one forum rather than the other, then the greater familiarity of the federal court sitting in that forum militates somewhat in favor of transfer. *See Longo v. Wal–Mart Stores, Inc.,* 79 F.Supp.2d 169, 173 (E.D.N.Y.1999); *Hernandez v. Graebel Van Lines,* 761 F.Supp. 983, 991 (E.D.N.Y. 1991).

Whether or not this case is transferred, any choice of law analysis will be conducted under the choice of law rules of New York. *See Van Dusen v. Barrack,* 376 U.S. 612, 621, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964) (choice of law analysis governed by transferor court's choice of law rules); *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (federal court applies choice of law rules of state in which it sits). With respect to tort actions, New York calls for application of the law of the forum with the greater interest in the adjudication. *See Curley v. AMR Corp.,* 153 F.3d 5, 12 (2d Cir.1998). Interest is determined with reference to the facts or contacts that relate to the purpose of the particular laws in conflict, which facts or contacts are "almost exclusively, the parties' domiciles and the locus of the tort." *Id.* McNulty is domiciled in the proposed transferee venue, while DealTime is an Israeli corporation. However, both parties' theories of the case at least implicitly recognize New York as the locus of the tort, and therefore these rules would call for application of the substantive law of New York. *See id.*

This factor weighs against transfer.

### 7. *Deference to DealTime's Choice of Forum*

 A plaintiff's choice of forum is generally entitled to "substantial deference." *Piper Aircraft Company v. Reyno,* 454 U.S. 235, 256, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). However, a foreign plaintiff's forum choice may merit less deference in a motion to transfer pursuant to § 1404. *See Creaciones Maternales De Mexico, S.A. de C.V. v. Kiddie Products, Inc.,* No. 94 Civ. 8007(JPK), 1995 WL 617188, *3 (S.D.N.Y. Oct.20, 1995) (recognizing lower deference standard and transferring action to Massachusetts pursuant

to § 1404(a) despite Mexican plaintiff's choice of forum in the Southern District of New York).[1]

McNulty argues that he should not have to litigate in DealTime's choice of forum simply because DealTime "won the race to the courthouse". However, DealTime disputes this characterization and argues that its claims are legitimate rather than merely anticipatory, and have a clear nexus to this venue. As discussed above, the most relevant events did take place in New York, so there has been no improper forum shopping. *See Toy Biz, Inc. v. Centuri Corp.*, 990 F.Supp. 328, 332 (S.D.N.Y. 1998) (finding no forum shopping where facts of case had significant connection to forum).

Deference to DealTime's choice of forum—even under the lower standard that may be applicable to foreign plaintiffs—weighs against transfer.

### 8. *The Interest of Justice*

McNulty has not argued that being haled into court in this venue will cause him undue financial hardship, nor offered any documentation to that effect. *See Dostana*, 2000 WL 1170134, *4.

### C. *Transfer is Not Warranted by the Weight of the Balancing Factors*

■ After balancing the convenience to the parties and witnesses and the interests of justice, McNulty has not shown that transfer is warranted. His motion is denied.

### III. *Dealtime's Motion to Dismiss Fourth and Fifth Counterclaims*

### A. *Legal Standard*

In reviewing a motion to dismiss under Rule 12(b)(6), a court must "accept as true the factual allegations of the complaint, and draw all inferences in favor of the pleader." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993) (citing *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1052 (2d Cir.1993)). Dismissal is warranted only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted). *See also Bass v. Jackson*, 790 F.2d 260, 262 (2d Cir.1986).

### B. *The Counterclaims Will Be Dismissed*

### 1. *Counterclaim 4: Common Law Fraud*

■ DealTime contends that the common law fraud claim should be dismissed as duplicative of the contract claim. Under New York law, to prevail on a fraud claim a plaintiff is required to prove: "(1) a material false representation or omission of an existing fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance, (5) that damages plaintiff." *Schlaifer Nance & Company, Inc. v. Estate of Warhol*, 927 F.Supp. 650, 660 (S.D.N.Y.1996), *aff'd* 119 F.3d 91 (2d Cir.1997) (citing *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 276 (2d Cir.1992)). "[E]ach ele-

---

1. The lower standard of deference for foreign plaintiffs' forum choice was established in the context of motions to dismiss actions brought by foreign plaintiffs pursuant to the equitable doctrine of *forum non conveniens*. *See Piper Aircraft*, 454 U.S. at 256, 102 S.Ct. 252, *Murray v. British Broadcasting Corp.*, 81 F.3d 287, 290 (2d Cir.1996). The first case McNulty cites for the lowered deference standard, *Ilusorio v. Ilusorio–Bildner*, 103 F.Supp.2d 672, 675 (S.D.N.Y.2000), is a *forum non conveniens* case, not a § 1404 case. However, in *Creaciones Maternales*, cited above, the court applied this reasoning to transfer motions brought pursuant to § 1404. *See also L.C. Baron, Inc. v. H.G. Caspari, Inc.*, 678 F.Supp. 100, 103 (E.D.Pa.1987) (granting § 1404 transfer because residence of citizen-defendant outweighed that of individual resident alien plaintiff under alien venue analysis). Therefore, the presumption favoring the plaintiff's chosen venue may be less strong when a defendant files a § 1404 motion to transfer a foreign plaintiff's action.

ment of a fraud claim must be shown by clear and convincing evidence." *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir.1995).

■ However, an action for fraud cannot lie where damages are merely sought for breach of contract. *See In re Chateaugay Corp.*, 10 F.3d 944, 958 (2d Cir.1993) (holding that a tort claim will not arise where plaintiff is essentially seeking enforcement of the bargain); *Fraser v. Doubleday & Company, Inc.*, 587 F.Supp. 1284, 1288 (S.D.N.Y.1984); *Matzan v. Eastman Kodak Co.*, 134 A.D.2d 863, 863, 521 N.Y.S.2d 917, 918 (N.Y.App.Div.1987).

In Counterclaim Four, McNulty alleges that he was fraudulently induced to invest in DealTime, to agree to the options package, and to provide advisory services. Specifically, McNulty alleges that DealTime made the following misrepresentations: (1) informing him that he would receive a better deal by receiving 500,000 stock options rather than shares of stock outright; (2) omitting any reference to any vesting schedule applicable to the options; and (3) informing him that the stock options were exercisable at any point over the following seven years.

■ According to McNulty, these statements were misrepresentations of present facts that induced him to enter into the contract, and therefore support a cause of action distinct from the claim for breach of contract. *See Chase v. Columbia Nat'l Corp.*, 832 F.Supp. 654, 661 (S.D.N.Y.1993) (New York law provides that "[a] counterclaim for fraudulent inducement which alleges a misrepresentation of a present fact, not a promise of future intent, which is the inducement for the contract, does not duplicate the contract claim . . . ."); *First Bank of Americas v. Motor Car Funding, Inc.*, 257 A.D.2d 287, 291, 690 N.Y.S.2d 17, 21 (1999) (same).

DealTime alleges that, if they were made, the aforementioned statements are in fact misrepresentations of future intent to comply with the contract, which are necessarily duplicative of the contract claim, rather than misrepresentations of present fact, which would support an independent fraud claim. *See id.; Grappo v. Alitalia Linee Aeree Italiane*, 56 F.3d 427, 434 (2d Cir.1995) ("A cause of action for fraud does not generally lie where the plaintiff alleges only that the defendant entered into a contract with no intention of performing it"); *Leonard v. Pepsico, Inc.*, 88 F.Supp.2d 116, 132 (S.D.N.Y.1999) (same); *New York University v. Continental Ins. Co.*, 87 N.Y.2d 308, 318, 639 N.Y.S.2d 283, 289, 662 N.E.2d 763 (N.Y. 1995) (same).

■ Therefore, for a fraud claim to survive a motion to dismiss in the context of a contract dispute, a plaintiff must show (1) that the fraud arises from some legal duty that is distinct from the duty to perform under the contract; (2) that the defendant has made a fraudulent misrepresentation collateral or extraneous to the contract (the "collateral promise rule"); or (3) that the plaintiff is entitled to special damages caused by the fraud which are not recoverable as contract damages. *See Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 20 (2d Cir.1996); *IKEA North American Services Inc. v. Northeast Graphics, Inc.*, 56 F.Supp.2d 340, 342 (S.D.N.Y.1999), *motion for reconsideration denied*, 66 F.Supp.2d 547 (S.D.N.Y.1999); *International Cabletel Inc. v. Le Groupe Videotron Ltee*, 978 F.Supp. 483, 491 (S.D.N.Y.1997) (fraud claim is viable in contract action if alleged misrepresentations pertained either to present facts or to future intent concerning a matter collateral to the contract). McNulty does not claim he is entitled to special damages.

■ Neither the seven-year option period nor the lack of any vesting requirement for the stock options was collateral to the contract. In fact, both went to the root of the agreement as reflected in the letter agreement backdated February 22, 1999, which (a) sets forth the seven-year

stock option exercise period, and (b) makes no mention of any vesting period.[2] *See* McNulty Ex. F. These representations pertained to terms of the agreement that McNulty was free to negotiate. *Cf. Alter v. Bogoricin,* No. 97 Civ. 0662(MBM), 1997 WL 691332, *9 (S.D.N.Y. Nov.6, 1997) (finding that party's "claim that he was fraudulently induced by pre-contractual promises is defeated by the stark fact that it was within his power to incorporate those promises ... into the [ ] Agreement.").

Moreover, the Counterclaim itself characterizes DealTime's alleged misrepresentations as regarding a possible future intent to change the terms of the contract, not a present intent to breach it. Specifically, the Counterclaim alleges that Dealtime's:

> statements were false and misleading when made because, at that time, it appears that the Company and Smith intended to impose an undisclosed and misrepresented vesting schedule to the options issued *in the event that they later deemed it in the Company's and/or Smith's best interest to do so.*

Ans. ¶ 107 (emphasis added). Dealtime's later attempt to circumvent these elements of the agreement may be remedied in a breach of contract action, not a fraud claim.

 Even if the statement that McNulty would receive a "better deal" with the stock options than the stocks themselves were false, McNulty cannot

show that he relied on it in deciding to invest in DealTime, because he turned over the $250,000 check before this statement was made. *See Beneficial Commercial Corporation v. Thomas,* 748 F.2d 756, 758 (2d Cir.1984) (setting forth reliance requirement of fraudulent inducement claim). McNulty was free to make further inquiries regarding the value of DealTime stock and stock options before turning over a $250,000 check at a lunch meeting, or before signing the letter agreement that giving him stock options rather than stocks. It is improper to file a fraud claim simply "because [a party] now thinks it should have negotiated a better deal." *Digital Equipment Corp. v. Desktop Direct, Inc.,* 511 U.S. 863, 882, 114 S.Ct. 1992, 2003, 128 L.Ed.2d 842 (1994). As McNulty has not stated a claim for fraudulent inducement, his Fourth Counterclaim will be dismissed.

### 2. *Counterclaim Five: Federal Securities Fraud*

 McNulty's fifth counterclaim alleges federal securities fraud under Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), (the "Exchange Act")[3], and Rule 10b–5 promulgated thereunder. Rule 10b–5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

---

2. However, the contract could also be read to include a vesting requirement, as the options were provided "in consideration of" his providing consulting and advisory services and serving as an outside director for Dealtime over a three-year period. McNulty Ex. F ¶¶ 1, 2. The vesting of stock options may be total and immediate, graduated over a period of years, or may take place upon the completion of stated service requirements. *See* American Bankers Ass'n, Banking Terminology 232 (1981). Upon either theory, the vesting of stock options goes to the root of their value and is not collateral to the contract.

3. Section 10b–5 provides that

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange...
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b)

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1990).

DealTime moves to dismiss this claim on the grounds that it fails to plead fraudulent intent with sufficient particularity.

In order to state a claim under Rule 10b–5, a plaintiff must allege that in connection with the purchase or sale of securities, the defendant, acting with intent to defraud, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused plaintiff injury. *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529 (2d Cir.1999) (*quoting In re Time Warner Inc. Secs. Litig.*, 9 F.3d 259, 264 (2d Cir.1993) (internal quotations omitted)). A 10b–5 claim must conform with the particularity obligations imposed by Federal Rule of Civil Procedure 9(b), which provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind may be averred generally."

In addition, section 21D(b)(2) of the Private Securities Litigation Reform·Act, 15 U.S.C. § 78u–4(b)(2) (1995) (the "Reform Act"), requires a plaintiff to "state with particularity" facts that raise a "strong inference of fraudulent intent," as required by preexisting Second Circuit law. *See Novak v. Kasaks*, 216 F.3d 300, 310–11 (2d Cir.2000) (recognizing that the Reform Act raised pleading 10b–5 standard to previously existing Second Circuit standard). For example, a claim would meet the Reform Act standard if it alleged that "when the promise was made, the defendant secretly intended not to perform or knew that he could not perform." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir.1993). *See Gurary v. Winehouse*, 190 F.3d 37, 44 (2d Cir.1999) (affirming dismissal of Rule 10b–5 claim where complaint did not allege that defendant "did not intend to do just what he promised at the times he made the statements" at issue.). Finally, just as discussed above, "[t]he failure to carry out a promise made in connection with a securities transaction is normally a breach of contract," not federal securities fraud. *Mills*, 12 F.3d at 1176.

McNulty's securities fraud counterclaim states, "it appears that" DealTime and Smith had an "undisclosed intention" to impose a vesting schedule on the stock options "in the event they later deemed it in [their] best interest to do so." Ans. ¶ 107. Even if this statement is construed as being founded "upon information and belief," it does not meet the strict pleading requirements of the Reform Act, which requires that a plaintiff "state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–49b(1). There is no indication on the face of the Fifth Counterclaim that DealTime· intended to deprive McNulty of his remaining stock options at the time the agreement was entered. Simply because those events subsequently came to pass does not satisfy the securities fraud requirement that DealTime have intended this outcome at the time it entered the securities contract.

Because McNulty has failed to plead intent sufficiently to sustain a federal securities fraud charge, his Fifth Counterclaim will be dismissed.

***Conclusion***

For the foregoing reasons, McNulty's motion to transfer is denied, and DealTime's motion to dismiss is granted.

It is so ordered.