**HSA RESIDENTIAL MORTGAGE SERVICES OF TEXAS,**
Plaintiff,

v.

**Joseph CASUCCIO, Jeffrey J. Schneider, Aaron Chaitovsky Robert Glass, and Werblin, Casuccio & Moses, P.C., Citrin Cooperman & Co., LLP, Defendants.**

No. 02CV1794(ADS)(WDW).

United States District Court,
E.D. New York.

March 15, 2003.

Shearman & Sterling, New York City (George J. Wade, and James L. Garrity, Jr., Of Counsel), for the Plaintiff.

Vedder, Price, Kaufman & Kammholz, New York City (John H. Eickemeyer, Of Counsel), for the Defendants Aaron Chaitovsky, Robert Glass and Citrin Cooperman & Co., LLP.

Wilson, Elser, Moskowitz, Edelman & Dicker LLP, New York City (Edward J. Boyle, Thomas R. Manisero, Fred N. Knopf, and Marc S. Voses, Of Counsel), for the Defendants Werblin, Casuccio & Moses, P.C. and Joseph Casuccio.

Jeffrey J. Schneider, Commack, Pro Se Defendant.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

The plaintiff HSA Residential Mortgage Services of Texas ("HSA" or the "plaintiff") brings this action against the defendants Joseph Casuccio ("Casuccio"), Jeffrey J. Schneider ("Schneider"), Aaron Chaitovsky ("Chaitovsky"), Robert Glass ("Glass"), Werblin, Casuccio & Moses, P.C. (the "Werblin Firm") and Citrin Cooperman & Co., LLP (the "Citrin Firm") alleging that they prepared and approved financial statements that were intended to cover up fraudulent schemes perpetrated by AppOnline.com, Inc ("AOP") and its subsidiary, Island Mortgage Network, Inc. ("Island") in violation of common law negligence and fraud. Presently before the Court are two motions to dismiss the complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, one by the Werblin Firm and Casuccio and another by the Citrin Firm, Chaitovsky and Glass.

## I. BACKGROUND

### A. The Parties

The facts are taken from the complaint unless otherwise noted. HSA is incorpo-rated and has its principal place of business in Texas. HSA is a purchaser for resale of residential real estate mortgage loans that it does not originate. The Werblin Firm is a partnership residing in Suffolk County, New York and is engaged in accounting and auditing. Casuccio is a resident of New York and a member of the Werblin Firm. Schneider is a resident of New York and was employed at the Werblin Firm. The Citrin Firm is a partnership residing in New York and is engaged in accounting and auditing. Chaitovsky and Glass are residents of New York and members of the Citrin Firm.

AOP is labeled a relevant non-party in the complaint. AOP is a Delaware corporation that had its principal place of business in New York. From 1997 to June 2000, AOP was a mortgage company. Between May 1997 to April 1999, AOP was known as IMN Financial, Inc. and operated under the trade name Island. Beginning in May 1997, AOP was quoted on the NASD's Over–the–Counter Electronic Bulletin Board. In September 1999, AOP began trading on the American Stock Exchange. On July 19, 2000, AOP filed for bankruptcy and ceased operations.

### B. The Facts

#### 1. The Fraudulent Scheme

AOP, through its subsidiary Island, provided mortgage loans to prospective homeowners. To fund these loans, "warehouse funders" such as HSA advanced monies to AOP under mortgage purchase agreements. After the closing of a mortgage loan, AOP sold the loan to financial institutions on the secondary mortgage market and used the proceeds from those sales to repay the warehouse funders. AOP's revenues consisted primarily of the points and other fees that borrowers paid in connection with obtaining the mortgage loan.

In 1997, AOP's common stock began trading publicly. At that time, AOP's senior management consisted of Paul Skulsky, Jeffrey Skulsky and Edward Capuano ("Capuano"). Paul Skulsky was responsible for coordination of the financing for AOP's operations and acquisitions; Jeffrey Skulsky was responsible for day-to-day management of AOP's administrative operations; Capuano was responsible for AOP's relationships with warehouse funders and supervision of its sales offices. Jeffrey Skulsky and Capuano were named officers of AOP. Paul Skulsky never received a formal title at AOP because he wanted to conceal the fact that he was a convicted felon and was acting as one of AOP's senior officers and directors.

In 1997, AOP expanded its operations through various acquisitions. During this time, AOP began losing money because the mortgage fees generated from those acquisitions did not cover its increased operating expenses. AOP covered its increased operating expenses by using the money that HSA and other warehouse funders provided for specific mortgage loans. Over time, this practice evolved into a "Ponzi Scheme". For example, AOP used later funds received from warehouse funders-designated to fund specific mortgage loans-to fund earlier mortgage loans. AOP also used any available funds to repay the warehouse funders, including funds that were provided for other mortgage loans, when a specific mortgage loan did not close and funds had to be returned to a warehouse funder.

### 2. The False Financial Statements

#### a. AOP's December 31, 1997 Financial Statements

In its internal and financial books, AOP recorded the amount wrongfully diverted from mortgage loan funds as a liability to certain escrow agents involved in the transfer of the mortgage loan funds, when AOP, in fact, owed the diverted funds to the warehouse funders. In its financial statements, AOP also disguised its growing liability to the warehouse funders by creating a "phantom" payable to The Skulsky Trust, which was a related party controlled by Paul Skulsky and Jeffrey Skulsky. To reduce the amount "supposedly" owed to The Skulsky Trust, AOP then offset certain debts "supposedly" owed to AOP by other related parties controlled by Paul Skulsky and Jeffrey Skulsky against AOP's liability to The Skulsky Trust. In addition, AOP violated Generally Accepted Accounting Principles ("GAAP") by offsetting the "supposed" receivables from other related parties against The Skulsky Trust payable.

On March 31, 1998, AOP filed a Form 10–KSB for the fiscal year ended December 31, 1997 which included AOP's 1997 financial statements (the "1997 Annual Report"). The Werblin Firm and Casuccio prepared, reviewed and approved the 1997 Annual Report which was allegedly in violation of GAAP and Generally Accepted Accounting Standards ("GAAS"). The 1997 Annual Report was allegedly false and misleading because it: (1) failed to disclose Paul Skulsky's management role at AOP; (2) failed to disclose that AOP had incurred a liability of at least $4,900,000 to warehouse funders and instead falsely reported that AOP owed approximately $4,900,000 to The Skulsky Trust; and (3) understated AOP's operating loss by an additional $700,000 by ignoring certain commission expenses and overstating income from management fees.

The Werblin Firm and Casuccio audited and approved the 1997 Annual Report and financial statements. The Werblin Firm and Casuccio were allegedly grossly negligent for blindly accepting AOP management's portrayal of AOP's financial condi-

tion and by failing to pursue information that would have disclosed the improprieties. The Werblin Firm and Casuccio allegedly knew that the warehouse funders, including HSA, would rely on the 1997 Annual Report and financial statements for that year.

### b. AOP's December 31, 1998 Financial Statements

During 1998, AOP's operations continued to lose money. Because AOP had diverted funds designated for specific mortgage loans to pay its operating expenses in 1997, AOP had to replace these funds so that those mortgage loans could close. To replace the diverted funds, AOP misappropriated even more funds from HSA and the warehouse funders. To conceal the increased debt owed to HSA and other warehouse funders, AOP continued to: (a) report falsely that it owed that debt to The Skulsky Trust; and (b) offset wrongfully receivables from other related parties against AOP's phony debt to The Skulsky Trust.

In addition to the fraud concerning its debt to the warehouse funders, Paul Skulsky, Capuano, Casuccio and the Werblin Firm artificially removed several money-losing subsidiaries from AOP's financial reports. For example, in March 1998 and October 1998, AOP entered into two phony sale transactions with Northport Industries, Inc. ("Northport"), a shell company controlled by Paul Skulsky. Through these transactions, AOP appeared to have sold certain subsidiaries to Northport but AOP continued to manage the subsidiaries. Northport executed a note payable to AOP for the subsidiaries and also agreed to pay AOP a management fee of $50,000 per month. As a result of these paper transactions, AOP avoided recognizing approximately $2,400,000 in losses sustained by the subsidiaries. The defendants allegedly knew or should have known that the Northport transactions were not arms-length transactions and that they served no business purpose except to enable AOP to avoid reporting the losses incurred by its subsidiaries.

On April 15, 1999, AOP filed an amended Form 10–KSB for the year ended December 31, 1998 (the "1998 Amended Annual Report"). The Werblin Firm, Casuccio and Schneider prepared, reviewed and approved the 1998 Amended Annual Report, which allegedly violated GAAP and GAAS. The 1998 Amended Annual Report was allegedly false and misleading because it: (1) failed to disclose the management role of Paul Skulsky; (2) failed to disclose that AOP owed at least $10,400,000 to the warehouse funders and instead stated falsely that AOP owed approximately $10,400,000 to The Skulsky Trust; (3) failed to report at least $2,400,000 in 1998 operating losses attributable to the subsidiaries that were the subject of the phony sales to Northport; and (4) inflated revenues and under-reported other expenses by approximately $735,000. AOP allegedly should have reported an operating loss of at least $3,200,000, instead of the $787,297 operating income that it reported.

The Werblin Firm, Casuccio and Schneider audited and approved the 1998 Amended Annual Report and financial statements. The Werblin Firm, Casuccio and Schneider were allegedly grossly negligent by blindly accepting AOP management's portrayal of AOP's financial condition and by failing to pursue information that would have disclosed the improprieties. The Werblin Firm, Casuccio and Schneider allegedly knew that the warehouse funders, including HSA, would rely on the 1998 Amended Annual Report and the financial statements for that year.

### c. AOP's December 31, 1999 Financial Statements

By December 31, 1999, AOP had misappropriated approximately $47,000,000 from its warehouse funders. By the end of 1999, Paul Skulsky, Jeffrey Skulsky and Capuano decided to remove AOP's phony liability to The Skulsky Trust from AOP's balance sheet without recognizing any liability to the warehouse funders. To achieve this objective, AOP issued 18,191,534 shares of its stock to The Skulsky Trust in exchange for extinguishing the debt AOP purportedly owed to The Skulsky Trust.

In December 1999, the Werblin Firm withdrew from its role as AOP's independent auditor. At Schneider's suggestion, AOP engaged the Citrin Firm as auditor of its 1999 financial statements. Schneider assisted the Citrin Firm by preparing the work papers for the audit and assisting the Citrin Firm to file the 1999 financial statements in a timely fashion. Schneider allegedly knew that the financial statements that he helped the Citrin Firm prepare contained false statements of material fact, including overstated mortgage inventory, understated operating losses and misrepresentations relating to losses attributable to the start-up of Island's proposed Internet spin-off division.

On April 14, 2000, AOP filed a Form 10-K for the year ended December 31, 1999 (the "1999 Annual Report"), which included AOP's financial statements. The 1999 Annual Report was false and misleading because it: (1) failed to disclose the management role of Paul Skulsky; (2) omitted $47,000,000 liability to the warehouse funders while stating that the previous purported debt to The Skulsky Trust had been exchanged for AOP equity securities; and (3) understated expenses and overstated revenues by approximately $1,500,000. Chaitovsky prepared, reviewed and audited the 1999 Annual Report. Glass and the Citrin Firm reviewed and approved the 1999 Annual Report.

The Citrin Firm, Chaitovsky and Glass audited and approved the 1999 Annual Report and financial statements for that year. The Citrin Firm, Chaitovsky and Glass were allegedly grossly negligent for blindly accepting AOP management's portrayal of AOP's financial condition and by failing to pursue information that would have disclosed the improprieties. The Citrin Firm, Chaitovsky and Glass allegedly knew that the warehouse funders, including HSA, would rely on the 1999 Annual Report and financial statements for that year.

Before completing their audit of the 1999 financial statements, the Citrin Firm, Chaitovsky and Glass learned that AOP had filed prior false financial statements with the United States Securities and Exchange Commission (the "SEC"). In particular, AOP's financial statements contained in the Form 10-QSB for the period ended September 30, 1999 were materially false in that they failed to include losses associated with AOP's Internet division. After learning of this false statement, the Citrin Firm, Chaitovsky and Glass failed to inform the appropriate AOP management personnel and make sure that AOP's audit committee was adequately informed of this false statement. The Citrin Firm, Chaitovsky and Glass also allegedly failed to notify the SEC or any other regulatory body about this false statement.

### d. Other False and Misleading Public Financial Statements

On December 29, 1999, AOP filed a Form S-1 which was materially misleading because it reported the false payable to The Skulsky Trust. In particular, the Form S-1 falsely stated that approximately $15,900,000 was owed to The Skulsky Trust as of September 30, 1999 when in

fact substantially more funds were owed to the warehouse funders at that time. Casuccio, Schneider and the Werblin Firm prepared, audited, reviewed and approved the false and misleading 1997 and 1998 financial statements which were incorporated in AOP's public filings.

### 3. The Related Criminal Proceedings

On October 23, 2001, Casuccio pleaded guilty to securities fraud conspiracy in connection with the allegation that he along with others knowingly prepared materially false and misleading financial statement which were provided to "warehouse" lenders and issued audit opinions that falsely represented that AOP's financial statement had been prepared in conformity with GAAP and had been conduct in accordance with GAAS. *See United States v. Casuccio,* No. 01–1098(DRH) (E.D.N.Y. Oct. 23, 2001). On October 24, 2002, a jury acquitted Schneider of similar charges. *See United States v. Schneider,* No. 02–128(DRH) (E.D.N.Y. Oct. 24, 2002).

### 4. The Related SEC Proceedings

On March 12, 2002, the SEC filed a complaint (the "SEC" Complaint") in the Eastern District of New York against, among others, Casuccio, Chaitovsky, Glass and Schneider alleging that they violated sections of the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act"). *See S.E.C. v. Skulsky,* No. 02–1524(DRH) (E.D.N.Y. filed Mar. 12, 2002). The SEC Complaint alleges that: (1) Casuccio audited AOP's 1997 financial statements and issued an audit opinion that falsely stated that those financial statements were prepared in compliance with GAAP and that the audits were conducted in accordance with GAAS; (2) Casuccio and Schneider audited AOP's 1998 financial statements and issued an audit opinion that falsely

stated that those financial statements were prepared in compliance with GAAP and that the audits were conducted in accordance with GAAS; (3) Chaitovsky and Glass audited AOP's 1999 financial statements and issued an audit opinion that falsely stated that those financial statements were prepared in compliance with GAAP and that the audit was conducted in accordance with GAAS; and (4) prior to completing their audit of the 1999 financial statements, Chaitovsky and Glass learned that AOP had filed prior false financial statements with the SEC, namely a Form 10–QSB for the period ended September 30, 1999 that failed to include losses associated with AOP's Internet division, and they failed to inform AOP's management and the SEC of this false statement in previous filings.

On May 21, 2002, the Honorable Denis R. Hurley resolved the SEC action against Casuccio by entering a partial final judgment of permanent injunction restraining and enjoining him from violating certain sections of the Securities Act and the Exchange Act. On October 18, 2002, Judge Hurley resolved the SEC action against Glass by entering a final consent judgment of permanent injunction restraining and enjoining him from violating certain sections of the Exchange Act and paying a civil penalty in the sum of $25,000. On October 18, 2002, Judge Hurley resolved the SEC action against Chaitovsky by entering a final consent judgment of permanent injunction restraining and enjoining him from violating certain sections of the Exchange Act and paying a civil penalty in the sum of $35,000. On October 21, 2002, the SEC suspended Chaitovsky and Glass from appearing or practicing as an accountant before the SEC for a minimum of 5 years.

### 5. The Instant Action

On March 22, 2002, HSA filed this complaint against the defendants in the East-

ern District of New York. The complaint asserts ten causes of action. The first claim alleges fraud against Casuccio and the Werblin Firm on the ground that they engaged in a fraudulent scheme to conceal AOP's true financial condition and made material misrepresentations and omissions in AOP's Form 10-k for the year ended December 31, 1997. The second claim alleges fraud against Casuccio, Schneider and the Werblin Firm on the ground that they engaged in a fraudulent scheme to conceal AOP's true financial condition and made material misrepresentations and omissions in AOP's Form 10-K for the year ended December 31, 1998.

The third claim alleges fraud against Schneider, the Citrin Firm, Chaitovsky and Glass on the ground that they engaged in a fraudulent scheme to conceal AOP's true financial condition and made material misrepresentations and omissions in AOP's Form 10-K for the year ended December 31, 1999. The fourth claim alleges negligent misrepresentation against Casuccio and the Werblin Firm on the ground that they knew HSA would and did rely on AOP's false and misleading 1997 financial statement. The fifth claim alleges negligent misrepresentation against Casuccio, Schneider and the Werblin Firm on the ground that they knew HSA would and did rely on AOP's false and misleading 1998 financial statement. The sixth claim alleges negligent misrepresentation against Schneider, Chaitovsky, Glass and the Citrin Firm on the ground that they knew HSA would and did rely on AOP's false and misleading 1999 financial statement.

The seventh claim alleges gross negligence against Casuccio and the Werblin Firm on the ground that they blindly accepted AOP management's portrayal of AOP's financial condition of its fiscal year ending in 1997 and failed to pursue information that would have disclosed such im-

proprieties. The eighth claim alleges gross negligence against Casuccio, Schneider and the Werblin Firm on the ground that they blindly accepted AOP management's portrayal of AOP's financial condition of its fiscal year ending in 1998 and failed to pursue information that would have disclosed such improprieties. The ninth claim alleges gross negligence against Schneider, Chaitovsky, Glass and the Citrin Firm on the ground that they blindly accepted AOP management's portrayal of AOP's financial condition of its fiscal year ending in 1999 and failed to pursue information that would have disclosed such improprieties. The tenth claim alleges aiding and abetting against the defendants on the ground that their acts, omissions and approval of financial statements assisted AOP in its fraudulent activities and false and misleading statements.

The defendants, except Schneider, now move to dismiss the complaint pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. The Werblin Firm and Casuccio jointly move to dismiss the complaint on the following grounds: (1) all of the claims are barred by the three-year statute of limitations for professional malpractice claims; (2) the claims of fraud fail to state a claim upon which relief can be granted; (3) the claims of negligent misrepresentation fail to state a claim upon which relief can be granted; and (4) the claim of aiding and abetting is inadequate under Rule 9(b) and New York law. The Citrin Firm, Chaitovsky and Glass jointly move to dismiss the complaint on the following grounds: (1) the claims of negligent misrepresentation and gross negligence fail to allege the "Linking Conduct" necessary to state a claim for relief; (2) the claim of fraud fails to satisfy the Rule 9(b) requirements; and (3) the claim of aiding and abetting is inadequate under Rule 9(b) and New York law.

The Court will first set forth the applicable standards, address the choice of law question and finally evaluate the sufficiency of each claim under the applicable law. For the sake of clarity, the Court will refer in the discussion section to the Werblin Firm and Casuccio who jointly filed their motion, collectively as "Werblin" and the Citrin Firm, Chaitovsky and Glass who jointly filed their motion, collectively as "Citrin".

## II. DISCUSSION

### A. The Standards

#### 1. Rule 12(b)(6)

A court may grant a Rule 12(b)(6) motion to dismiss for failure to state a claim only when " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief.' " *Tarshis v. Riese Org.*, 211 F.3d 30, 35 (2d Cir.2000), *abrogated on other grounds, Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The court must accept as true all of the factual allegations set out in the complaint, draw inferences from those allegations in the light most favorable to the plaintiff, and construe the complaint liberally. *See id.* (citing *Desiderio v. National Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 202 (2d Cir.1999)).

■ In applying these principles, the court "must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Tarshis*, 211 F.3d at 39 (citing *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991)). It is proper to take judicial notice of pleadings from other lawsuits attached to a defendant's motion to dismiss, "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir.1991). At the pleading stage of most cases, the plaintiff must only provide a "short and plain statement" that "give[s] the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz*, 534 U.S. at 512–513, 122 S.Ct. 992 (citing *Conley*, 355 U.S. at 47, 78 S.Ct. 99).

#### 2. Rule 9(b)

■ Rule 9(b) sets forth additional pleading requirements with respect to the allegations of fraud. In particular, Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). But, under Rule 9(b), "[m]alice, intent, knowledge and other condition of mind of a person may be averred generally." *Id.* To comply with Rule 9(b), the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 51 (2d Cir.1995) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993)).

### B. Choice of Law

■ Werblin and Citrin argue that New York law governs all of HSA's claims. HSA responds that Texas law governs. Because jurisdiction is based on diversity of citizenship, the Court must apply the choice of law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed.

1477 (1941); *Lee v. Bankers Trust Co.,* 166 F.3d 540, 545 (2d Cir.1999).

█ Under New York's choice of law rules, the first question is whether a choice of law analysis is necessary due to an actual conflict of laws. *Matter of Allstate Ins. Co. (Stolarz),* 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 613 N.E.2d 936 (1993). Only where the applicable laws at issue provide different substantive rules must a conflict of laws analysis be done. *See Pescatore v. Pan Am. World Airways, Inc.,* 97 F.3d 1, 14 (2d Cir.1996) (holding that an actual conflict existed where Ohio law allowed for consideration of loss of society for damages but New York law did not); *Bader v. Purdom,* 841 F.2d 38, 39–40 (2d Cir.1988) (holding that an actual conflict existed where jurisdictions differed concerning the availability of recovery under a negligent parental supervision theory). Where the laws at issue are not in actual conflict, the court applies New York law. *See Curley v. AMR Corp.,* 153 F.3d 5, 12 (2d Cir.1998) ("It is only when it can be said that there is no actual conflict that New York will dispense with a choice of law analysis."); *Simon v. Philip Morris Inc.,* 124 F.Supp.2d 46, 71 (E.D.N.Y.2000) ("A court is free to bypass the choice of law analysis and apply New York law in the absence of a material conflict.") (citing *Curley,* 153 F.3d at 12).

█ Where there is an actual conflict of laws concerning a tort claim, New York courts apply an "interest analysis". *Curley,* 153 F.3d at 12. Interest analysis looks to the law of the jurisdiction with the greatest interest in the litigation. *Id.* In deciding which jurisdiction has the greatest interest in the litigation, two separate inquiries are required: "(1) what are the significant contacts and in which jurisdiction are they located; and (2) whether the purpose of the law is to regulate conduct or allocate loss." *Padula v. Lilarn Prop-*

*erties Corp.,* 84 N.Y.2d 519, 521, 620 N.Y.S.2d 310, 644 N.E.2d 1001 (N.Y.1994). The first inquiry assures that the court identifies which jurisdictions have an interest in having their law apply in the litigation.

█ The second inquiry distinguishes "between a choice-of-law analysis involving standards of conduct and one involving the allocation of losses." 84 N.Y.2d at 522, 620 N.Y.S.2d 310, 644 N.E.2d 1001. This inquiry recognizes that a jurisdiction's interest "in having [its] law apply will depend on the particular tort issue in conflict in the case." *Schultz,* 65 N.Y.2d at 198, 491 N.Y.S.2d 90, 480 N.E.2d 679 (N.Y.1985). When the conflicting laws involve the standard of conduct, the law of the place of the tort will usually govern. *Id.* The New York Court of Appeals has explained:

> [W]hen the conflicting rules involve the appropriate standards of conduct, rules of the road, for example, the law of the place of the tort 'will usually have a predominant, if not exclusive, concern' ... because the locus jurisdiction's interests in protecting the reasonable expectations of the parties who relied on it to govern their primary conduct and in the admonitory effect that applying its law will have on similar conduct in the future assume critical importance and outweigh any interests of the common-domicile jurisdiction.

*Schultz,* 65 N.Y.2d at 198, 491 N.Y.S.2d 90, 480 N.E.2d 679 (quoting *Babcock v. Jackson,* 12 N.Y.2d 473, 483–484, 240 N.Y.S.2d 743, 191 N.E.2d 279 (N.Y.1963)). "Conduct-regulating rules have the prophylactic effect of governing conduct to prevent injuries from occurring." *Padula,* 84 N.Y.2d at 522, 620 N.Y.S.2d 310, 644 N.E.2d 1001. " 'If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest

interest in regulating behavior within its borders.'" *Id.* (quoting *Cooney v. Osgood Mach.,* 81 N.Y.2d 66, 72, 595 N.Y.S.2d 919, 612 N.E.2d 277 (N.Y.1993)).

■ When the conflicting laws involve the allocation of loss, "the law of the state where at least one of the parties is domiciled generally applies." *AroChem Int'l, Inc. v. Buirkle,* 968 F.2d 266, 270 (2d Cir.1992). In that regard, the Second Circuit has explained that:

> The locus state has little interest in controlling the remedies available to non-domiciliaries injured by admittedly tortious conduct, *i.e.,* conduct recognized by conduct-regulating rules as tortious in each interested state. If the parties share a domicile, that state is obviously most interested in enforcing its loss-allocating rules.

*Id.* (citation omitted). It is within this framework that the Court will address the choice of law question presented here.

**1. Actual Conflict**

The complaint asserts claims of fraud, negligent misrepresentation, gross negligence and aiding and abetting. A review of those claims reveals that New York and Texas law are in actual conflict only with respect to the negligent misrepresentation claim.

First, there is no material conflict with respect to the fraud claim. The elements of fraud are essentially the same in both states. *Compare Wynn v. AC Rochester,* 273 F.3d 153, 156 (2d Cir.2001) (noting that the elements of fraud under New York law are a material misrepresentation or omission, scienter, reasonable reliance, causation and damages) *with Ernst & Young, LLP v. Pacific Mut. Life Ins. Co.,* 51 S.W.3d 573, 577 (Tex.2001) (noting that the elements of fraud under Texas law are a materially false representation, with knowledge of falsity or recklessness, with

intention that plaintiff rely on it and that the plaintiff's justifiable reliance caused injury suffered). Indeed, HSA's claim of fraud must survive the heightened particularity requirements of Rule 9(b) whether based on Texas, New York or any other law. *See Stern v. Gen. Elec. Co.,* 924 F.2d 472, 476 n. 6 (2d Cir.1991). As such, the Court will apply New York law and the pleading requirements of Rule 9(b) to the fraud claim.

Second, there is no material conflict between New York and Texas law with respect to the gross negligence claim because neither state appears to recognize such claim against an accountant. *See Equitable Life Assur. Soc. of U.S. v. Alexander Grant & Co.,* 627 F.Supp. 1023, 1033 (S.D.N.Y.1985) ("While grossly negligent conduct may lead to an inference of fraud, there is no independent action for gross negligence against accountants. Plaintiff has already claimed fraud, so to the extent this cause is based on the ability of gross negligence to infer fraud, it is redundant.") (internal quotation marks and citation omitted). HSA cites no case where an accountant was held liable for gross negligence under Texas law and the Court has found none. In its brief, HSA does not even address the gross negligence claim under Texas law. As such, the Court will apply New York law to the gross negligence claim.

Third, there is no material conflict between New York and Texas law with respect to the aiding and abetting claim. The elements of aiding and abetting are essentially the same in both states. *Compare Nigerian Nat. Petroleum Corp. v. Citibank, N.A.,* No. 98–4960, 1999 WL 558141, at *8 (S.D.N.Y. July 30, 1999) (noting that the elements of aiding and abetting under New York law are the existence of an underlying fraud, knowledge of the fraud on the part of the aider and abettor,

and substantial assistance by the aider and abettor in accomplishing the fraud) *with Crisp v. Southwest Bancshares Leasing Co.*, 586 S.W.2d 610, 615 (Tex.Civ.App. 1979) (noting that the elements of aiding and abetting under Texas law are knowledge of the primary fraud, intentionally and substantially aided and abetted the fraud). As such, the Court will apply New York law to the aiding and abetting claim.

Fourth, there is a material conflict between Texas and New York law with respect to the negligent misrepresentation claim. Specifically, New York requires a plaintiff to show either actual privity of contract between the parties or a relationship approaching privity, while Texas does not. *Compare Parrott v. Coopers & Lybrand LLP*, 95 N.Y.2d 479, 483, 718 N.Y.S.2d 709, 741 N.E.2d 506 (N.Y.2000) (stating that in a claim of negligent misrepresentation a plaintiff must show "either actual privity of contract between the parties or a relationship so close as to approach that of privity.") *with Averitt v. PriceWaterhouseCoopers L.L.P.*, 89 S.W.3d 330, 335 (Tex.App.2002) (stating that privity is not required to hold an accountant liable to a third party arising from the accountant's misrepresentations). Because there is an actual conflict of laws concerning the negligent misrepresentation claim, the Court will conduct a choice of law analysis for that claim.

### 2. Interest Analysis

■ As noted above, the Court must apply an interest analysis to decide which jurisdiction has the greatest interest in having its law govern the negligent misrepresentation claim. *Padula*, 84 N.Y.2d at 521, 620 N.Y.S.2d 310, 644 N.E.2d 1001. In deciding this question, the Court will address two separate issues: (1) what jurisdictions have significant contacts in this action; and (2) whether the negligent misrepresentation claim is designed to regulate conduct or allocate loss. *See id.*

### a. Significant Contacts

New York and Texas are the only two jurisdictions with contacts relevant to the instant action. Texas has a contact to this action because HSA is incorporated and has its principal place of business there. New York has a contact to this action for the following reasons: (1) all of the defendants reside there; (2) AOP has its principal place of business there; and (3) all of the audit work and preparation of audit papers for AOP were performed in New York.

### b. Regulation of Conduct vs. Allocation of Loss

The negligent misrepresentation claim is a conduct-regulating law. *See Simon*, 124 F.Supp.2d at 57 (noting that fraud and consumer protection claims largely implicate conduct regulating laws). As such, the law of the place of the tort should usually govern this claim. *See Schultz*, 65 N.Y.2d at 198, 491 N.Y.S.2d 90, 480 N.E.2d 679. The reason is that the jurisdiction where the tort occurred has the greatest interest in regulating behavior within its borders. *Padula*, 84 N.Y.2d at 522, 620 N.Y.S.2d 310, 644 N.E.2d 1001.

For claims sounding in negligence, courts generally apply the law of the state where the injury is suffered, rather than the state where the negligent conduct occurred. *See Schultz*, 65 N.Y.2d at 195, 491 N.Y.S.2d 90, 480 N.E.2d 679 ("[W]hen the defendant's negligent conduct occurs in one jurisdiction and the plaintiff's injuries are suffered in another, the place of the wrong is considered to be the place where the last event necessary to make an actor liable occurred."). This general rule is referred to as the "last event necessary test". *See Simon*, 124 F.Supp.2d at 57–58.

Under the last event necessary test, Texas law would likely govern because HSA allegedly suffered its injury there because it is incorporated and has its principal place of business in Texas.

The last event necessary test however is not dispositive. *Id.* ("This simple 'last place' criterion is not chiseled in stone but rather gives way when it is at war with state interests so that the more general *Babcock* principle [interest analysis] applies."). Rather, courts must still conduct an interest analysis. *See id.* at 58. ("[A] careful reading of *Schultz* indicates that the 'last event necessary test' does not displace New York interest analysis."); *AroChem*, 968 F.2d at 271 (refusing to apply the last event necessary test where the conflicting rule did not involve regulating conduct and a state's interest in having its law apply was paramount); *Pescatore*, 97 F.3d at 12–14 (applying interest analysis, despite last event necessary test, in plane crash over Scotland where causative misconduct occurred in either Frankfurt or London); *Cromer Fin. Ltd. v. Berger*, 137 F.Supp.2d 452, 492 (S.D.N.Y.2001) (refusing to apply the last event necessary test where a single state was overwhelmingly the center of gravity of the events at issue and that state's interest in regulating the conduct of work performed there was strong).

New York has the greatest interest in having its law govern the negligent misrepresentation claim. First, New York has a strong interest in defining the scope of liability for accountants who work in its state. In that regard, New York has a long standing history of limiting the scope of an accountant's liability only to those non-clients who can show that they were in a relationship approaching privity with the accountant. *Secs. Inv. Protection Corp. v. BDO Seidman, LLP*, 95 N.Y.2d 702, 711–712, 723 N.Y.S.2d 750, 746 N.E.2d 1042 (2001); *Parrott v. Coopers & Lybrand, LLP*, 95 N.Y.2d 479, 483–484, 718 N.Y.S.2d 709, 741 N.E.2d 506 (2000); *Sec. Pacific Bus. Credit v. Peat Marwick Main & Co.*, 79 N.Y.2d 695, 702–703, 586 N.Y.S.2d 87, 597 N.E.2d 1080 (1992); *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 551, 493 N.Y.S.2d 435, 483 N.E.2d 110 (N.Y.1985). The importance of this limitation "rests on concern for the indeterminate nature of the risks and that such a requirement is necessary in order to provide fair and manageable bounds to what otherwise could prove to be limitless liability." *Parrott*, 95 N.Y.2d at 483, 718 N.Y.S.2d 709, 741 N.E.2d 506. Revealing the significance of this limitation, New York has extended this rule in cases involving other professions, such as lawyers and engineering consultants. *Id.*

Second, the negligent misrepresentation claim arises from the audit work and preparation of audit papers that Werblin and Citrin performed in New York. *See Brink's Ltd. v. South African Airways*, 93 F.3d 1022, 1032 (2d Cir.1996) (noting the location of the alleged misconduct is a factor in an interest analysis); *Cromer*, 137 F.Supp.2d at 492 (noting that a substantial part of the alleged misconduct occurred in New York). Third, it is reasonable for Werblin, Citrin and HSA to expect that New York law would govern the negligent misrepresentation claim, especially since all of the parties except HSA reside in New York and the alleged misrepresentations occurred there. *See Pescatore*, 97 F.3d at 14 (noting that the parties' reasonable expectations of the applicable law are relevant in an interest analysis) (citing *Schultz*, 65 N.Y.2d at 201–202, 491 N.Y.S.2d 90, 480 N.E.2d 679).

Fourth, New York has the more significant interest in having its conduct-regulating law govern in order to regulate behavior within its borders. *See Padula*, 84

N.Y.2d at 521, 620 N.Y.S.2d 310, 644 N.E.2d 1001. Finally, it is unreasonable to allow Texas law, or any other law, to dictate the appropriate conduct for accountants or professionals vis-a-vis non-client third-parties where all of the events occurred in New York. *See AroChem,* 968 F.2d at 271 (applying California law to a judicial-proceeding privilege which was conduct-regulating and California had a strong interest in its law governing); *Cromer,* 137 F.Supp.2d at 492 (noting New York's strong interest in having its law apply where defendants conducted themselves pursuant to standards in New York). Accordingly, the Court finds that New York law governs the negligent misrepresentation claim.

In sum, New York law will govern the determinations with regard to all the causes of action in this case.

## C. The Statute of Limitations

██ Werblin argues that all of the claims are barred by the three year statute of limitations for professional malpractice. This argument is without merit. In the first instance, HSA does not allege a malpractice claim but rather claims of fraud, negligent misrepresentation, gross negligence and aiding and abetting. In addition, HSA can not maintain a malpractice claim because it is not a client of Werblin or Citrin. *See Credit Alliance Corp. v. Arthur Andersen & Co.,* 101 A.D.2d 231, 236, 476 N.Y.S.2d 539 (1st Dep't 1984), *reversed on other grounds,* 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (N.Y.1985) ("[A]n action brought by an individual or group of individuals, not in privity with a professional such as an accountant, but whose reliance on that professional's work was foreseeable, is an action for negligence and not one for malpractice."). Furthermore, all of the claims asserted are not barred by the statute of limitations-fraud (six years); negligent misrepresentation (six year); and aiding and abetting (six years). *See* N.Y. C.P.L.R. § 213(8). Accordingly, Werblin's motion to dismiss the claims pursuant to the statute of limitations for malpractice is denied.

## D. The Sufficiency of the Claims

### 1. Fraud

██ Werblin and Citrin argue that the complaint fails to plead fraud with the necessary particularity. To state a claim for fraud under New York law, a plaintiff must allege (1) a material, false representation by a defendant; (2) made with the intent to defraud; (3) reasonable reliance upon the representation by the plaintiff; and (4) causing damage to the plaintiff. *Suez Equity Investors, L.P. v. Toronto-Dominion Bank,* 250 F.3d 87, 104 (2d Cir. 2001).

Rule 9(b) adds additional pleading requirements with respect to allegations of fraud. This specificity is necessary to (1) "afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based;" (2) "[t]o safeguard [ ] defendant's reputation and goodwill from improvident charges of wrongdoing;" and (3) "to inhibit the institution of strike suits." *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1057 (2d Cir.1993) (quoting *Ross v. Bolton,* 904 F.2d 819, 823 (2d Cir.1990) (citations omitted)).

██ As noted above, Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). "Malice, intent, knowledge and other condition of mind of a person [however] may be averred generally." *Id.* In order to comply with Rule 9(b), the complaint must "(1) specify the statements that the plaintiff

contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 51 (2d Cir.1995) (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)). The Court will address the sufficiency of the allegations of fraud against Werblin and Citrin separately.

### a. Werblin

■ HSA has adequately alleged Werblin's misrepresentations. The complaint alleges that AOP's 1997 Annual Report, which Werblin prepared, reviewed and approved, was false and misleading because it: (1) failed to disclose Paul Skulsky's management role at AOP; (2) failed to disclose that AOP had incurred a liability of at least $4,900,000 to warehouse funders and instead falsely reported that AOP owed approximately $4,900,000 to The Skulsky Trust; and (3) understated AOP's operating loss by an additional $700,000 by ignoring certain commission expenses and overstating income from management fees.

The complaint also alleges that AOP's 1998 Amended Annual Report, which Werblin prepared, reviewed and approved, was false and misleading because it: (1) failed to disclose the management role of Paul Skulsky; (2) failed to disclose that AOP owed at least $10,400,000 to the warehouse funders and instead stated falsely that AOP owed approximately $10,400,000 to The Skulsky Trust; (3) failed to report at least $2,400,000 in 1998 operating losses attributable to the subsidiaries that were the subject of the phony sales to Northport; and (4) inflated revenues and under-reported other expenses by approximately $735,000. AOP allegedly should have reported an operating loss of at least $3,200,000, instead of the $787,297 operating income that it reported. All of the

above allegations specify the statements that were fraudulent, identify the speaker, state where and when the statements were made, and explain why the statements were false. As such, these allegations are sufficient to give Werblin fair notice of HSA's claim.

■ HSA adequately alleges that Werblin was aware of the alleged misstatements in the financial statements. To satisfy this requirement under New York law, awareness, namely scienter, may be shown through either gross negligence or recklessness. *See In re CBI Holding Co., Inc.,* 247 B.R. 341, 367 (Bankr.S.D.N.Y.2000) (citing *State Street Trust Co. v. Ernst,* 278 N.Y. 104, 15 N.E.2d 416 (1938)). In that regard, the complaint alleges that AOP and Werblin: (1) disguised in AOP's financial statements its growing liability to the warehouse funders by creating a "phantom" payable to The Skulsky Trust, an entity controlled by a principal of AOP, and then offset receivables from other related parties against the phony debt; (2) understated AOP's operating losses and overstated income from management fees; (3) artificially removed several money-losing subsidiaries from AOP's financial reports through sham transactions with a shell corporation; and (4) extinguished the false debt to the Skulsky Trust by issuing shares of AOP stock. These allegations sufficient show Werblin was grossly negligent or reckless when it prepared, reviewed and approved AOP's financial statements. HSA has sufficiently alleged that it reasonably relied on the representation in the financial statements and that it suffered damages as a result of that reliance. Accordingly, Werblin's motion to dismiss the fraud claims is denied.

### b. Citrin

HSA has adequately alleged Citrin's misrepresentations. The complaint alleges

that AOP's 1999 Annual Report, which Citrin prepared, reviewed and approved, was false and misleading because it: (1) failed to disclose the management role of Paul Skulsky; (2) omitted $47,000,000 liability to the warehouse funders while stating that the previous purported debt to The Skulsky Trust had been exchanged for AOP equity securities; and (3) understated expenses and overstated revenues by approximately $1,500,000. In addition, the complaint alleges that Citrin learned of a previously false financial statement that AOP filed with the SEC but then failed to report the false statement to AOP's management or the SEC. All of the above allegations specify the statements that were fraudulent, identify the speaker, state where and when the statements were made, and explain why the statements were false. These allegations are therefore sufficient to give Citrin fair notice of HSA's claim.

HSA adequately alleges that Citrin was aware of the alleged problems with the financial statement. As noted above, HSA satisfies this element with a showing of either gross negligence or recklessness. In that regard, the complaint alleges that in preparing AOP's 1999 Annual Report Citrin relied on Werblin's prior financial statements that were materially false, despite Citrin learning that those financial statements and prior audits contained misstatements, including two transactions involving over $12,000,000 with entities controlled by Paul and Jeffrey Skulsky. These allegations sufficient show Werblin was, at a minimum grossly negligent, when it prepared, reviewed and approved AOP's 1999 Annual Report. HSA has adequately alleged that it reasonably relied on the representations in the financial statement and that it suffered damages as a result of that reliance. Accordingly, Citrin's motion to dismiss the fraud claims is denied.

### 2. Negligent Misrepresentation

■ To state a claim for negligent misrepresentation under New York law, a plaintiff must show that: "(1) an awareness by the maker of the statement that it is to be used for a particular purpose; (2) reliance by a known party on the statement in furtherance of that purpose; and (3) some conduct by the maker of the statement linking it to the relying party and evincing its understanding of that reliance." *Parrott v. Coopers & Lybrand, L.L.P.*, 95 N.Y.2d 479, 484, 718 N.Y.S.2d 709, 741 N.E.2d 506 (N.Y.2000) (internal quotation marks and citation omitted). "These indicia, while distinct, are interrelated and collectively require a third party claiming harm to demonstrate a relationship or bond with the once-removed accountants." *Id.* (internal quotation marks and citation omitted).

■ At this stage of the litigation, HSA need only give fair notice of the negligent misrepresentation claim and the grounds upon which it rests. *See Swierkiewicz*, 534 U.S. at 512–513, 122 S.Ct. 992 (citing *Conley*, 355 U.S. at 47, 78 S.Ct. 99). The heightened pleading requirements of Rule 9(b) are not required. *In re LILCO Securities Litigation*, 625 F.Supp. 1500, 1504 (E.D.N.Y.1986) ("[N]egligent misrepresentation is not a claim that necessitates the particularized pleading of Rule 9(b)."). HSA alleges that AOP relied on the availability of credit from its warehouse funders, including HSA; that HSA and the other warehouse funders relied on Werblin's and Citrin's opinion concerning the accuracy of AOP's financial statements; that those opinions would be passed on to HSA for that purpose; and that Werblin and Citrin knew HSA would rely on their opinions.

At this stage of the litigation, HSA has set forth sufficient facts to give fair notice

of the negligent misrepresentation claim. HSA's ability to survive a motion for summary judgment or trial where its burden becomes greater will raise a different question. Accordingly, the motions to dismiss the negligent misrepresentation claims are denied.

### 3. Gross Negligence

 As noted previously, New York does not recognize an independent claim of gross negligence against accountants. *See Equitable Life Assur. Soc. of U.S. v. Alexander Grant*, 627 F.Supp. 1023, 1033 (S.D.N.Y.1985). Accordingly, those claims are dismissed with prejudice.

### 4. Aiding and Abetting

In order to state a claim for aiding and abetting under New York law, a plaintiff must allege: (1) the existence of an underlying fraud; (2) knowledge of that fraud on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor to accomplish the fraud. *See Oei v. Citibank, N.A.*, 957 F.Supp. 492, 520 (S.D.N.Y.1997) (citing *Morin v. Trupin*, 711 F.Supp. 97, 112 (S.D.N.Y.1989)). As such, liability for aiding and abetting "require[s] actual knowledge of the primary wrong" by the defendant. *Williams v. Bank Leumi Trust Co. of New York*, No. 96–6695, 1998 WL 397887, at *8 (S.D.N.Y. July 15, 1998).

At this stage of the litigation, HSA has adequately alleged the aiding and abetting claim. The complaint alleges the existence of an underlying fraud, namely AOP's scheme to defraud the warehouse funders; that Werblin and Citrin had knowledge of that scheme, *see supra* Part II.D. 1.a-b; and that they provided substantial assistance through their approval of the financial statements. Accordingly, the motions to dismiss the claim of aiding and abetting are denied.

## III. CONCLUSION

Based upon the foregoing, it is hereby

**ORDERED**, that New York law governs all of the claims in the complaint; and it is further

**ORDERED**, that the motions to dismiss the claims of fraud, negligent misrepresentation and aiding and abetting are denied; and it is further

**ORDERED**, that the motions to dismiss the claims of gross negligence are granted with prejudice; and it is further

**ORDERED**, that the parties are directed to contact the Honorable William D. Wall forthwith to set an expedited discovery schedule.

**SO ORDERED.**